Georgia HALL and Edward
Hall, Appellees,

v.

GENERAL MOTORS CORPORATION,
Buick Division, Appellant,

Larry Buick, Incorporated.

No. 79–2106.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 23, 1980.

Decided Dec. 24, 1980.

Harold Ungar, Washington, D. C., with whom Aubrey M. Daniel, III and Robert P. Watkins, Washington, D. C., were on brief, for appellant.

Solomon L. Margolis, Washington, D. C., with whom Allan L. Kamerow, Stanley H. Kamerow, Washington, D. C., and Gerald I. Holtz, Rockville, Md., were on brief, for appellees.

Before ROBB, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

On a clear September afternoon in 1975, Georgia Hall had a tragic accident. Her five-month old Buick Electra left Suitland Parkway in the District of Columbia and careened across a grassy field until it collided with a tree. The accident left Mrs. Hall a quadriplegic.

Mrs. Hall and her husband, invoking federal jurisdiction based on diversity of citizenship, commenced this damage action against the manufacturer, General Motors Corporation ("GM"), and the dealer, Larry Buick, Inc. Prior to trial, the plaintiffs entered into a settlement with the dealer, pursuant to which Mrs. Hall received $700,000, and her husband, $50,000. In accordance with the settlement, plaintiffs' claims against Larry Buick and Larry Buick's cross-claim against GM were dismissed with prejudice.[1]

A bifurcated jury trial was held at which United States District Judge June L. Green presided. On May 2, 1979, the jury returned a verdict against GM on the issue of liability. On May 31, the jury awarded damages in the amount of $5 million for Mrs. Hall, and $1.5 million for her husband. On GM's motion, Judge Green ordered and the plaintiffs accepted a remittitur reducing Mr. Hall's award (for loss of consortium) to $500,000. Judge Green denied GM's motion to reduce the damage awards by 50% because of the Halls' pre-trial settlement with the co-defendant Larry Buick, Inc. She did, however, reduce the awards by the amounts the Halls had received pursuant to the settlement. The total judgment, as adjusted, is therefore $4.75 million,

---

1. J.A. 35, 36 ("J.A." refers to the Joint Appendix submitted by the parties).

$4.3 million for Georgia Hall and $450,000 for her husband.[2]

In this appeal, GM seeks reversal or modification of the District Court's judgment on three principal grounds. First, GM asserts that the charge erroneously permitted the jury to find liability based on an unidentified defect in the Buick. The plaintiffs' evidence identified only the drive shaft as defective, GM points out. Since plaintiffs did not attempt to prove a causative defect in any part of the vehicle other than the drive shaft, GM claims entitlement to an instruction tying liability to a finding that the drive shaft was defective. Second, GM challenges several rulings made in the course of trial. Third, GM maintains that the Halls' settlement with the co-defendant Larry Buick, Inc., requires reduction of the judgment against GM by 50%.

We conclude that Judge Green, adhering to this court's decision in *Stewart v. Ford Motor Co.*, 553 F.2d 130 (D.C.Cir.1977), properly instructed the jury; that her rulings at trial yielded no reversible error; and that she properly denied GM's motion for a 50% reduction in the judgment. We therefore affirm.

## I. Facts

On September 29, 1975, in full daylight, Georgia Hall was driving alone in her 1975 Buick, purchased some five months earlier. She was in the right-hand, eastbound lane on Suitland Parkway, maintaining a speed of 40–45 miles per hour along the dry, smooth road. As GM described the accident, the car veered to the right, crossed the shoulder into a field of grass, then traveled across an elevated exit-entrance ramp into a wooded area where it hit a tree that stood over 700 feet from the road. When the car crossed the ramp, Mrs. Hall was thrown from behind the wheel. Witnesses found her lying across the front seat with her foot "hooked up" between the accelerator and the brake pedal. She had

suffered a broken neck, resulting in permanent quadriplegia.

Mrs. Hall's testimony indicated that, at the time of the accident, she was a healthy woman, who did not drink or take drugs. She was an experienced driver and, when the fateful episode occurred, she was traveling on a familiar road maintaining, according to her testimony, a moderate speed. She said she heard a loud explosion while the car was on the road, followed by vibrations and popping. As the car surged off the road, she claimed that she mashed continuously on the brakes but the car would not stop. She had lost control.

The Halls presented evidence of their multiple complaints about the car, complaints they reported repeatedly to the dealer, Larry Buick, Inc. Surging, vibrations, and other malfunctions existed, the Halls said, from the time Mrs. Hall purchased the car until the time of the accident. Despite inspections and servicing by the dealer, no correction was accomplished.

The car's drive shaft system was found after the accident to have been destroyed. At trial, the Halls attempted to show that a defect in the shaft had caused the accident. GM, on the other hand, maintained that the destroyed drive shaft was the result of the accident, not its cause. The cause, GM suggested, was Mrs. Hall's momentary inattention to the road, followed by panic, which led her to apply the accelerator instead of the brake.[3]

Expert testimony on behalf of the plaintiffs accounted for the accident roughly as follows. A defective joint in the drive shaft exploded on the highway, causing the rear of the shaft, with part of the joint still attached, to drop to the road, still spinning rapidly. The force of the contact with the road produced a forward reaction, upward and to the right, which pushed the drive shaft tube into the rear of the transmission housing with sufficient force to raise the

---

**2.** On appeal, GM does not challenge the adjusted judgment as excessive.

**3.** GM did not choose to cross-examine Mrs. Hall, however. Under the District of Columbia

law applicable to this diversity action, it was GM's burden to show negligence, if any existed, on Mrs. Hall's part. *Ballard v. Polly*, 387 F.Supp. 895, 901 (D.D.C.1975).

car off its suspension and drive it from the road. This testimony also attributed the intermittent vibrations, about which the Halls had complained prior to the accident, to defects in the rear portion of the drive shaft.

GM, contrarily, presented evidence to support its contention that the drive shaft did not disintegrate until the car smashed into the ground after traversing the elevated exit-entrance ramp. In particular, GM showed that the seventeen separate parts of the shaft found after the accident were all in the immediate vicinity of the area where the violent ground impact had occurred. GM further pointed out that the police accident investigator, called to the scene immediately after the accident, found no scratches or stains on the road that could be associated with the Halls' theory of the accident. In addition, GM presented a wealth of expert testimony supporting its position that Mrs. Hall's Buick was not defective in any material respect.

## II. *The* Stewart *Instruction*

■ Judge Green gave the following instruction to the jury regarding GM's liability:[4]

> [P]laintiffs need not prove a specific defect [in the Buick].
>
> It is sufficient if you find from the evidence that the motor vehicle in question went out of control causing the accident as a result of some mechanical failure due to an obvious or hidden defect in the car which existed at the time that it left General Motors Corporation.

In *Stewart v. Ford Motor Co.,* 553 F.2d 130, 136, 141 (D.C.Cir.1977), based on District of Columbia precedent, we approved this form of instruction for use in motor vehicle accident product liability cases. GM asserts that the state of the evidence in this case warranted an instruction less generous to the plaintiffs. The jury should have been instructed to return a verdict for the Halls, GM contends, only if it found that "some unreasonably dangerous defect in the drive shaft assembly" caused the accident.[5] We conclude that Judge Green properly patterned her instruction on the *Stewart* model.

This court held in *Stewart* that a plaintiff established her case by presenting (1) evidence tending to negate causes for the accident other than a defect in the car, and (2) evidence tending to show that the defendant-manufacturer introduced into the car whatever defect might have existed. *Id.* at 137. The court stated explicitly that the quantum of evidence required for these showings is not great. Further, the *Stewart* opinion indicated that proof that the product was new would warrant a jury inference that a defect, if there was one, existed at the time the product entered the stream of commerce. In addition, *Stewart* observed that a plaintiff would be called upon to negate only the most obvious causes, such as intoxication or excessive speed, unless the defendant offered specific accounts of how the accident might have happened in the absence of a defect in the automobile. *Id.* at 138.

The Halls brought their case comfortably within the *Stewart* frame. Mrs. Hall testified that, prior to the accident, her physical condition was excellent. She did not drink, suffer from diabetes, sickle cell anemia, epilepsy, or any other disease that could have caused dizziness or blackout spells. She did not have any mental disorders or high blood pressure and did not use any drugs. She further testified that she was an experienced driver (for fourteen years she had been a part-time cab driver), that she was familiar with the area in which the accident occurred (it was about a mile from her home), and that her speed at the time she heard an explosion had been 40–45 miles per hour.[6]

Mrs. Hall had purchased her Buick five months prior to the accident.[7] From the start, the Halls experienced difficulties with

---

4. J.A. 1911–12.

5. Brief of Defendant-Appellant at 13.

6. J.A. 331–32, 349.

7. J.A. 332.

the vehicle and sought correction from the seller, GM dealer Larry Buick, Inc. On several occasions following the purchase, the Halls complained to the dealer that the engine would miss, vibrate, hesitate upon acceleration, backfire, and run hot; the brakes would squeal; the idle was rough; sometimes the car would pull to the right, sometimes it would "just take off." [8]

GM did not vigorously contest these facts. It did, however, strenuously challenge the testimony of experts called by the Halls to show that a drive shaft defect caused the accident. GM put on a massive array of technical evidence to convince the jury that the accident was not caused by any defect in Mrs. Hall's Buick. Most of this evidence was designed to rebut the plaintiffs' proof concerning the drive shaft. In addition, GM sought to eliminate other possible manufacturer-related causes of the accident. Experts called by GM stated and explained their opinion that the drive shaft did not fail and that no other defects in Mrs. Hall's Buick could have occasioned the accident. Moreover, on cross-examination, both of the plaintiffs' experts conceded that they had identified no specific defect in the car, other than the drive shaft. In particular, they acknowledged that, as far as they could determine, there was no malfunction in the automobile's steering, acceleration, or braking systems.[9]

GM urges that its evidentiary presentation and the concessions it elicited from plaintiffs' expert witnesses eliminated every possible cause of the accident apart from a defect in the drive shaft and Mrs. Hall's own negligence. Accordingly, GM maintains, Judge Green's instructions should have riveted the jury's attention to the drive shaft as the sole legally permissible basis for a finding of manufacturer's liability in this case.[10]

We believe the showing GM made did not warrant displacement of the *Stewart* instruction. The Halls sought to present the jury with alternative arguments: (1) a "specific theory" that an identifiable automobile part had failed, causing the accident; and (2) a "general theory" that *some* unpinpointed defect introduced into the automobile by the manufacturer was responsible for the accident. *Stewart* held that the effort to prove a specific defect does not foreclose submission of the case to the jury on a general theory. If an attempt to pinpoint a defect tied plaintiffs to a specific theory, personal injury claimants would be deterred from introducing evidence beyond proof tending to show absence of fault on the part of the accident victim and unexplained malfunctioning of the vehicle. 553 F.2d at 141.

In this case, in addition to post-accident expert testimony concerning the drive shaft, Mrs. Hall presented substantial evidence of numerous unresolved problems she had experienced with her Buick prior to the accident. She could not detect the source of the problems, nor had GM's dealer eliminated them when Mrs. Hall complained and brought in the car for post-purchase inspections. We cannot say that GM's evidence or its cross-examination of witnesses for the Halls foreclosed the jury from finding that Mrs. Hall's Buick was defective when she purchased it, was never put in proper repair despite Mrs. Hall's repeated efforts to secure dealer correction, and went out of control as a result of some mechanical failure, apart from the drive shaft, attributable to GM.

### III. *Trial Rulings*

GM complains that Judge Green's control of the trial unreasonably inhibited its de-

---

**8.** J.A. 266–76, 334, 2532, 2534, 2536.

**9.** J.A. 501–02, 1738.

**10.** GM alternately sought special interrogatories designed to have the jurors identify the defect that, in their view, had caused the accident. J.A. 49–50. The interrogatories submitted, however, risked leaving the jurors with the erroneous impression that GM must prevail

unless the jury could pinpoint a specific accident-producing defect in the Buick. *Stewart* rules out constraining the jury in the manner suggested.

  GM concedes, as it must, that the form of verdict is within the trial court's discretion. *See, e. g., Skidmore v. Baltimore & O. R. R.,* 167 F.2d 54 (2d Cir. 1948).

fense. She committed reversible error, GM asserts, in (1) rejecting test evidence proffered by GM, (2) denying GM the right to counter "surprise evidence" a witness for the plaintiffs supplied for the first time on rebuttal, (3) providing the jurors with a copy of a deposition favorable to plaintiffs while withholding from them portions of other depositions favorable to GM, and (4) truncating GM's cross-examination of one of plaintiffs' two expert witnesses. We have reviewed GM's objections and are unable to conclude that "anything done or omitted" by the trial court was "inconsistent with substantial justice." *See* Fed.R. Civ.P. 61.

*Test Evidence*

In an attempt to pinpoint a specific defect in Georgia Hall's Buick, the plaintiffs sought to establish that the drive shaft broke off at the constant velocity joint,[11] causing the car to surge upward and to the right, careening out of control off the road. As part of its massive effort to disprove this theory, GM conducted a series of tests. In the first test GM ran, a 1975 Buick Electra's drive shaft was taped, not bolted, at the rear; it was then pushed by another car until it attained a speed of 50 miles per hour, at which point the engine speed was correspondingly increased and the transmission was shifted into "drive." Supporting GM's position, the shaft eventually dropped to the road, but there was no upward or rightward pull.

At a pre-trial session, Judge Green rejected this test on the ground that it did not depict a situation sufficiently comparable to that of Mrs. Hall's vehicle at the time of the accident.[12] Over plaintiffs' objection, however, and although the trial was to start in two weeks time, Judge Green permitted GM to pursue further testing.

GM next conducted tests with bolted rather than taped rear flange yokes. The yokes were deliberately and increasingly weakened with the aim of determining what would happen when a defective rear flange yoke breaks and the drive shaft then drops to the ground. This aim was not achieved because the shaft never came apart. Judge Green permitted GM to introduce expert testimony explaining this testing. Still photographs were admitted as well, but not motion pictures.

GM also sought to introduce testimony that a car used in the experiments, equipped with the most defective yoke, withstood a trip from Michigan to Washington, D.C., without incident. Plaintiffs' representative, who had attended the earlier testing, all of it occurring in Michigan, had returned to Washington, D.C., to prepare for trial before the road test occurred. Judge Green excluded evidence concerning this test on the ground, *inter alia*, that time for GM's experiments had run out.

Judge Green's central concern, in ruling on GM's tests, was to keep from the jury experiments conducted under conditions not sufficiently similar to the circumstances surrounding the accident. A test is not admissible unless the test conditions are "so nearly the same in substantial particulars [as those involved in the episode in litigation] as to afford a fair comparison in respect to the particular issue to which the test is directed." *Illinois Central Gulf R. R. v. Ishee*, 317 So.2d 923, 926 (Miss.1975), *quoted with approval in Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977). The trial judge has broad leeway in making this determination; her ruling will not be upset unless it is clearly erroneous. *Derr v. Safeway Stores, Inc.*, 404 F.2d 634, 639 (10th Cir. 1968). We cannot say that Judge Green's test evidence rulings exceeded the latitude appropriately accorded trial courts in this area.

---

11. The drive shaft transmits the power of the engine from the transmission to the rear wheels, which propel the car. The drive-shaft tube is a hollow cast-iron cylinder. It is fitted, both front and rear, into flexible joints. The rear or "constant velocity" joint is welded to the drive-shaft tube, and the rear-most part of the joint (the rear flange yoke) is then bolted to the differential of the rear axle. *See* Brief of Defendant-Appellant at 6 n.5.

12. *See* J.A. 99.

Judge Green excluded GM's first proffered test for insufficient comparability: the drive shaft was taped, not bolted, at the rear; the test car was pushed, not driven, to a speed of 50 miles per hour. We find no abuse of discretion in her determination. *Cf. Collins v. B. F. Goodrich & Co.*, 558 F.2d 908 (8th Cir. 1977); *Weaver v. Ford Motor Co.*, 382 F.Supp. 1068 (E.D.Pa.1974).

As to the second test series, Judge Green acceded to GM's proffer, except for the film. We see no clear error in her exclusion of motion pictures that "[did] not portray original facts in controversy." *See* McCormick, Law of Evidence § 214, at 534 (2d ed. 1972). Nor do we see error in Judge Green's exclusion of the test drive from Michigan to Washington, D.C., a test of limited probative value conducted at the eleventh hour when plaintiffs' representative was no longer in attendance.

*"Surprise" Testimony*

■ GM claims that a key issue at trial was whether the engine in Mrs. Hall's Buick was still running when the car crashed into a tree. GM presented substantial evidence in support of its contention that the engine was on. Plaintiffs' expert Vanderhoof testified on rebuttal that an exhibit used by GM to demonstrate that the engine was running (the harmonic balancer removed from Mrs. Hall's car) had been altered after GM purchased the wreck from the Halls. GM, claiming surprise, sought to call every person who had touched the car or had custody of the exhibit from the time of the accident to the time of trial to prove that there had been no alteration. Judge Green refused to allow further testimony. She said: "I don't know of any provision that permits a rebuttal of a rebuttal." [13]

If Judge Green intended her ruling to be an exercise of discretion, her remark failed to convey that intention. GM correctly points out that surrebuttal evidence is permitted in appropriate circumstances. *See United States v. Compania Cubana de Aviacion, S. A.*, 224 F.2d 811, 822 (5th Cir. 1955). We agree that the ruling here should not have been made "as a matter of law." Nonetheless, we believe that no substantial right of GM was affected by exclusion of the surrebuttal testimony GM proposed.

GM sought to recall "everybody that had possession of [Mrs. Hall's] car." [14] The proffered parade of witnesses would have been an extremely time-consuming presentation of cumulative testimony. Abundant evidence already in the record supported GM's position that the engine was running even after the calamitous collision with the tree, including eyewitness testimony and detailed explanations by GM's experts.[15] Moreover, GM's counsel failed to make a specific offer of proof clarifying which witnesses it proposed to call and the anticipated content of their testimony. In light of these factors, we do not share GM's assessment of the significance of Judge Green's ruling.[16]

*Jury Access to Depositions*

■ During its deliberations, the jury sent a note to the court requesting "Depositions—Ms. Hall, Officer Wing, Ms. Williams, Mr. Porter." [17] Judge Green furnished the jury with Mr. Porter's deposition. She declined to send in the others. We find GM's objection to her ruling meritless.

Mr. Porter was an eyewitness to the accident. He died prior to trial. Without objection, counsel for plaintiffs read into the

---

13. J.A. 1592.

14. J.A. 1585.

15. The jury accepted the defense invitation to compare the allegedly altered exhibit with a photograph of the harmonic balancer conceded to be accurate. J.A. 1873–74.

16. To the extent GM sought to introduce the surrebuttal testimony in support of its position that the accident could have resulted only from

Mrs. Hall's inattention and panic, we note again that GM did not avail itself of the opportunity to cross-examine Mrs. Hall concerning the care she exercised in driving and in attempting to avoid the collision. Mrs. Hall testified on direct that she remained conscious at all relevant times. J.A. 346–47.

17. J.A. 54.

record his entire deposition except for the last few sentences.[18]

The other witnesses gave live testimony. Snippets of Officer Wing's deposition were used by GM first to refresh his recollection, then to rehabilitate him following cross-examination.[19] A sliver of Ms. Williams' testimony was used by GM for impeachment purposes.[20] A few lines at page 68 of Mrs. Hall's deposition were read by counsel for GM during the cross-examination of plaintiffs' expert witness, William Wall.[21] Another few lines, from page 59 of Mrs. Hall's deposition, were read into the record by GM's counsel just before the defense rested.[22]

Counsel for plaintiffs objected to furnishing the jury with isolated portions, "blurbs" from lengthy depositions, unaccompanied by related live testimony against which the jury could measure the lines snipped from the pre-trial statements.[23] Judge Green agreed that supplying the jury with a few lines of a deposition would not be fair.[24] Her judgment seems to us unassailable.[25]

The difference between a deposition of a dead witness read in full in lieu of live testimony and extracted portions of a deposition used to impeach, refresh recollection, or rehabilitate is apparent. The danger of acceding to a request that a few lines from a deposition read at trial go to the jury room is well illustrated in the transcript before us. One example suffices. To impeach Ms. Williams, GM read to her a brief portion of her pre-trial statement in which she described a conversation with Mrs. Hall at the hospital. An answer she gave favored GM's version of the accident. After the deposition extract was read to the jury, Ms. Williams was asked: "You gave those answers to those questions, did you not?" Ms. Williams replied: "Yes, that was a mistake." [26]

GM took the position that "the jury should be provided with those portions of each of the requested depositions that had been read into evidence." [27] Counsel for GM did not request that Judge Green respond to the jury's note by sending them, together with extracts from the depositions, related portions of the transcript amplifying, or inconsistent with, the deposition extracts. If such a request had been made and denied, we would be presented with a different question.

## Qualifications and Cross-Examination of Plaintiffs' Expert Vanderhoof

Plaintiffs' witness, Mr. Vanderhoof, was offered and accepted as an expert in auto mechanics and accident reconstruction.[28] GM contends that Mr. Vanderhoof possessed requisite qualifications only in the field of auto mechanics. GM challenges Judge Green's initial ruling, her adherence to it, and, most vigorously, her refusal to permit GM to cross-examine Vanderhoof on his purported expertise as an "accident reconstructionist." We believe Judge Green

18. J.A. 350–59. The last portion was omitted at GM's request because it related more to the issue of damages (which had been reserved for separate trial) than to the issue of liability. GM did not indicate in what respect, if any, the Porter deposition adversely affected GM's position. Mr. Porter described the accident and made no statements GM challenged. Indeed, his testimony supported GM's contention that the engine had not stalled. *See* J.A. 357.

19. J.A. 679, 711. Plaintiffs' counsel had also read from Wing's deposition on cross-examination. J.A. 707–08.

20. J.A. 634–35.

21. J.A. 1773–74.

22. J.A. 1530–31. Again we note GM chose not to examine Mrs. Hall at trial.

23. J.A. 1929–30.

24. J.A. 1931.

25. Although on this record the case is clear, we note the considerable discretion the trial court has in responding to jury requests for depositions or transcripts of testimony. *See Murray v. United States*, 130 F.2d 442, 444 (D.C.Cir. 1942).

26. J.A. 635.

27. Brief of Defendant-Appellant at 37.

28. An accident reconstruction expert is apparently one who is qualified to give an opinion as to the cause of an accident without having witnessed the event. *Cf.* J.A. 682.

committed no reversible error when she accepted Vanderhoof as an expert[29] and later adhered to that ruling on the ground that objection made after completion of Vanderhoof's direct examination came too late. Nor did she abuse her discretion to control the order of evidentiary presentation when she refused to permit GM to use cross-examination as a substitute for the voir dire inquiry GM failed to pursue.[30]

Even if we could credit GM's contention that its counsel was caught unaware or tricked when plaintiffs' counsel sought and obtained the initial ruling, we would be left without a satisfactory explanation for GM's failure to raise the point during the direct examination of Vanderhoof.[31] It was not until the next day, after its cross-examination was well under way, that GM first apprised Judge Green that it objected to treatment of Vanderhoof as an accident reconstruction expert.[32] At that point Judge Green ruled that GM was free to cross-examine Vanderhoof on the bases for opinions he ventured on direct, but not on his qualifications as an expert.[33] GM has supplied no persuasive ground for overturning that determination.[34] *See* Wigmore on Evidence § 922 (Chadbourn Rev.1970); *Farris v. Delta Air Lines*, 456 F.2d 236, 237 n.1 (5th Cir. 1972) (once witness is offered and accepted as an expert, impeachment through cross-examination as to basic qualifications is inappropriate).

The long trial in this action required an attentive, sustained effort by the participants. It is impossible, in such a venture, for the human actors in it to play out their roles free from flaw. For this reason, Fed. R.Civ.P. 61 instructs judges to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Operating under a more stringent standard, courts "would become Penelopes, forever engaged in unravelling the webs they wove."[35] Because we find no ruling in this case "inconsistent with substantial justice," we reject GM's plea that we vacate the judgment and order a new trial.

### IV. *The Co-Defendant's Settlement*

On the eve of the trial, the Halls' claims against the dealer, Larry Buick, Inc., were dismissed with prejudice, as was Larry Buick's indemnification cross-claim against GM. The dismissals followed Buick's pretrial settlement with the Halls. GM asserts that the settlement deprived it of the right to seek pro rata contribution it otherwise would have had against Buick. To compensate for the alleged loss of a right to seek contribution, GM contends that the judgment should be pared down by half (from $5.5 million to $2.75 million). Judge Green offset the amount of the settlement ($750,000), but refused to reduce the judgment further.

We conclude that GM received the appropriate credit in this action and is not entitled to more. First, it is not at all clear that the settlement stripped GM of a right to contribution it otherwise would have had. Second, no District of Columbia case recognizes a right to pro rata (50%) reduction of a plaintiff's judgment against a nonsettling defendant when the settling defendant's liability *vel non* has not been determined.

---

29. J.A. 453–54.

30. GM's counsel, in the midst of cross-examining Vanderhoof, sought to challenge Vanderhoof's qualifications on the ground that in his deposition responses Vanderhoof had not claimed to be an accident reconstructionist. Counsel apologized to the court for not raising the question earlier, stating "It was not intentional. I noted it last night for the first time." J.A. 511.

31. *See* J.A. 455–64, 475–77 (opinions elicited from Vanderhoof without objection).

32. J.A. 507–11.

33. J.A. 509.

34. Nor is prejudice to GM apparent. Later in the trial GM elicited without objection that Vanderhoof was "self taught," held no degrees, had only a 10th grade education, never had and never heard of training in identifying marks at a vehicle accident scene, was an expert mechanic but did not represent himself to be an expert in failure analysis or any other field. J.A. 1568, 562, 1579–80.

35. *Jorgensen v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir. 1947) (remark there made in relation to imperfections in jury performance).

Finally, if GM wished to safeguard any legitimate claim it might have to lessen the burden of a plaintiffs' verdict, a cross-claim against Larry Buick was available to it.

GM assumes that the settlement left it without recourse to an independent action for contribution against Larry Buick. We believe that question remains open. Our own decisions are inconclusive,[36] and GM has not called to our attention, nor have we found, any answer in decisions of the District of Columbia courts. We decline to forecast the ruling that might be made were GM to sue Larry Buick for contribution. In view of our decision in *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1082–84 (D.C.Cir.1974), we have reason to doubt whether GM would wish to pursue such a claim.

In *Williams v. Steuart Motor Co.*, this court held that when a car manufacturer and dealer are both found liable for an accident caused by a defect in the car, and the charge against the dealer is negligent failure to detect and repair the defect, the manufacturer ordinarily must indemnify the dealer. The dealer's right to indemnification against the manufacturer is hardly consistent with a right in the manufacturer to seek contribution from the dealer.

Turning to the relevant District of Columbia case law on pro rata reduction of a damage award, we find brackets around the case GM portrays this one to be. If a trier of fact has found the settling defendant liable, pro rata (50%) reduction may be ordered. *Martello v. Hawley*, 300 F.2d 721, 724 (D.C.Cir.1962). If a trier of fact has

exonerated the settling defendant, only pro tanto (the amount of the settlement) reduction is available. *Snowden v. D.C. Transit System*, 454 F.2d 1047 (D.C.Cir.1971). Larry Buick, the settling defendant here, was neither found liable nor exonerated. Again, we decline to proceed beyond the point where District of Columbia precedent leaves off, for GM had a clear opportunity to settle the issue of Larry Buick's liability. It might have filed a cross-claim against Buick.

■ GM correctly points to the general rule that cross-claims are permissive, not compulsory. *See* Fed.R.Civ.P. 13(g). But in this case, GM was on the receiving end of a cross-claim. Larry Buick, Inc., when it answered the Halls' complaint, also asserted a cross-claim against GM. The cross-claim stated that if the Halls should succeed in establishing that the vehicle was defective, then Larry Buick avers that the car was defective when obtained from GM. The defective condition, Buick contended, would constitute a breach of GM's warranty to Buick. GM generally denied the allegations contained in Buick's cross-claim, but asserted no claim on its part against Buick.

We do not hold that GM was compelled to meet dealer Buick's cross-claim with one of its own. If matured claims were involved, an answering cross-claim might well be compulsory.[37] But claims for contribution and indemnity contingent upon the outcome of another claim have not been placed in the compulsory category.[38] Thus GM's decision not to cross-claim against Buick in this action does not preclude GM from pursuing Buick in a separate action.

---

**36.** *Compare Keleket X-Ray Corp. v. United States*, 275 F.2d 167, 169 (D.C.Cir.1960) ("We know of no reason why the law should let action or inaction of the injured party defeat a claim to contribution. Neither releasing one tort-feasor, . . . nor allowing a statute of limitations to run in favor of one tort-feasor, . . . should be permitted to have that effect."), *with Martello v. Hawley*, 300 F.2d 721, 722 (D.C.Cir.1962) (out-of-court settlements by alleged tort-feasors should be accorded protective finality). In *Martello*, the jury, in response to the nonsettling defendant's claim for contribution, had found the settling defendant liable. *See id.* at 722, 724.

**37.** *See* 3 Moore's Federal Practice ¶ 13.12[1], at 13–276 to 277 (2d ed. 1980):

[I]f defendant *X* pleads a cross-claim against his co-party, defendant *Y*, the latter must plead as a counterclaim any claim which he (*Y*) has against *X* that arises out of the same transaction or occurrence which is made the basis of *X*'s cross-claim.

*See also id.* ¶ 13.34[1].

**38.** *See, e. g., Chicago Freight Car Leasing Co. v. Martin Marietta Corp.*, 66 F.R.D. 400 (N.D. Ill.1975); *Hartford Accident & Indemnity Co. v. Levitt & Sons, Inc.*, 24 F.R.D. 230 (E.D.Pa. 1959). These decisions reason that contribution and indemnity claims are contingent on

We do hold, however, that in view of the multiple uncertainties clouding GM's alleged contribution right, the Halls' judgment should not be altered. GM has offered us no reason to believe that, had there been no settlement between Larry Buick and the Halls, part of the compensation awarded the Halls would have come out of dealer Buick's pocket. *See Williams v. Steuart Motor Co., supra.* Nor is it clear that the settlement between the Halls and Buick deprives GM of any genuine contribution claim it may have against Buick. *See* note 36 *supra.* GM had an opportunity to cross-claim and passed it by. GM is therefore not comfortably situated to urge that we chart new law *regarding reduction of judgments* when an alleged joint tort-feasor settles. *See* p. 184 *supra.* In summary, GM presents no convincing justification for withholding from the Halls full compensation for their injuries.

For all the foregoing reasons, the judgment of the District Court is

*Affirmed.*

the outcome of the main claim and therefore do not fit the Fed.R.Civ.P. 13(a) compulsory counterclaim formula: "A pleading shall state as a counterclaim any claim *which at the time of serving the pleading the pleader has* against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." (emphasis added).