Frederick James **JOHNSON**, et al., Plaintiffs,

v.

Ernest Albert **STROUSE**, et al., Defendants and Third–Party Plaintiffs,

v.

**DISTRICT OF COLUMBIA**, et al., Third–Party Defendants.

Civ. A. No. 87–295 (RCL).

United States District Court, District of Columbia.

Sept. 2, 1988.

George A. Schmiedigen, Washington, D.C., for plaintiffs.

Thomas Patrick Ryan, McCarthy, Wilson, Ethridge & Quinn, Rockville, Md., for defendants and third-party plaintiffs.

Kathleen A. Carey, Asst. Corp. Counsel, Washington, D.C., for third-party defendant Dist. of Columbia.

Patrick Kavanaugh, Hamilton and Hamilton, Washington, D.C., for third-party defendant Potomac Elec. Power Co.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Frederick James Johnson and his wife, Beverly Ann Johnson, brought this action in tort against Ernest Albert Strouse and his father, Ernest Herbert Strouse. Ernest Albert was the driver, and Ernest Herbert the owner, of a car which struck Mr. Johnson's car at the intersection of Kenyon Street and Sherman Avenue, Northwest, in the District of Columbia.

The Strouses in turn bring a third party complaint against the District of Columbia and Potomac Electric Power Company ("PEPCO") in contribution and indemnity, claiming that the traffic signals at the intersection in question were not operating at the time of the accident. The Strouses have since paid the Johnsons $100,000 in settlement without admitting fault, and have also dismissed their third party claim against PEPCO, receiving $15,000 in settlement from the utility. At the bench trial, the Strouses sought $35,000 from the only remaining party, the District of Columbia, but now in a post trial memorandum seek $42,500 in contribution. The Strouses contend that as a joint tort-feasor the District should not benefit from the Strouses' settlement with PEPCO, but rather should split equally with them the remaining damages of $85,000.

*Findings of Fact*

Frederick James Johnson was driving his automobile north on Sherman Avenue at about 6:30 a.m. on December 6, 1985, approaching the intersection at Kenyon Street. Meanwhile Ernest Albert Strouse was driving west on Kenyon, approaching

Sherman at about 30 to 35 miles per hour, five to ten miles per hour over the speed limit. It was still dark, requiring the drivers to use their headlights. Johnson's view of westbound traffic coming from Kenyon Street was partially obstructed by a small hill, while Strouse's view of northbound traffic on Sherman was likewise obstructed by the same hill as well as by cars parked on the side of Kenyon Street. Although the intersection at Sherman and Kenyon had a full compliment of traffic signals, they were completely extinguished due to a malfunction.

Johnson entered the intersection first. Strouse, who was unaware he was approaching a cross street, did not slow down until Johnson's car suddenly appeared only 10 to 20 feet away, too late for Strouse to avoid colliding with it.

By the time of the accident, the traffic signals at Kenyon and Sherman had at least a brief history of malfunction. There had been one malfunction reported in October, 1985 to the District's Traffic Signal Control Branch; another in November; and on December 5, the day before the accident, there were four reported malfunctions. The first was an "all out," reported at 5:40 p.m. to the District. A technician was notified at 5:41 p.m., arrived at the scene at 6:00 p.m., and the problem was "cleared" at 8:10 p.m. [Third Party] Plaintiffs' Exhibits (TPPE) 31 and 32. The second malfunction that night, a grounded cable, was reported at 7:05 p.m. (apparently by the same technician who responded to the first call), and was cleared at 10:10 p.m.; however, the report shows that the flashing circuit (the backup system to normal signal operations) remained inoperative. TPPE 33. There were two other problems reported that night, one of which was not cleared until sometime the next morning. *See* TPPE 34 and 35. Further, the backup flashing circuit was never repaired until after the accident.

The next morning, before the accident, a Traffic Signal Control employee named

Chuck Stewart was on patrol in the area of the accident looking for defective traffic signals. Shortly after 6:00 a.m., he observed that the signals at Kenyon and Sherman were once again "all out," and reported this at 6:12 a.m. However, a technician was not notified until almost an hour later, at 7:07 a.m. TPPE 36. Meanwhile, Stewart left the scene without seeking police assistance, without setting flares, and without taking any other step to alleviate the danger at the intersection. The accident occurred just a few minutes later, at about 6:30 a.m.

*Conclusions of Law*

### 1. *Liability*

■ As a preliminary matter, it is clear from the evidence at trial that third party plaintiff Ernest Albert Strouse was negligent. It is undisputed that he was driving his father's car somewhat in excess of the speed limit. Further, Johnson's car had entered the uncontrolled intersection first, which required Strouse to yield the right of way under District of Columbia Municipal Regulations. 18 DCMR § 2208.1[1] (1981). Thus, Strouse was in violation of two traffic laws resulting in the very harm each was intended to avoid; further, he offered no evidence sufficient to explain or excuse his violations, and this constitutes negligence *per se*. *Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 692 (D.C.Cir. 1987).

Strouse did testify that he was unable to tell he was approaching an intersection since the signal lights were out, given the prevailing early morning darkness together with his unfamiliarity with Kenyon Street. This might be plausible were it not also true that he was speeding; unfamiliar surroundings cloaked in darkness should have engendered caution.

■ The harder question here is whether the District of Columbia was likewise negligent, and if so whether Strouse can collect damages from the District in contribution.[2]

---

1. 18 DCMR § 2208.1 states "The driver of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection from a different highway."

2. Strouse can not establish indemnification by the District, since there was no contract for indemnity between the District and Strouse, since there is no contention that the District is

The District argues that although the report of an "all out" by its employee Stewart the morning of the accident was not relayed to a technician until almost an hour after Stewart called it in, the accident occurred only about 18 minutes after he called in. Therefore, any further delay beyond 18 minutes in responding was not a proximate cause of the accident, and the District is under no duty to respond to a traffic signal malfunction report in less than 18 minutes. This is particularly true when, as here, the intersection involved is not a major one, and where it was known that the District's police department had a policy of not responding to a call requesting an officer to control such an intersection when its traffic signals go out.

But what troubles the Court is that a District employee was present at the scene as part of his duties, recognized that the signal lights were out, and yet left the scene in that condition having done nothing to reduce the evident danger until repairs could be completed. He knew that for some significant period of time, until a technician could be found and dispatched to the scene, that the intersection would be without traffic signals and without any other means of warning approaching automobiles of danger.

The District contends that where traffic signals at an intersection are not functioning, 18 DCMR § 2208.1, *supra,* places the "onus" on approaching drivers, and that the District can not be held liable as joint tort-feasor when a collision occurs. However, this proposition contains no support in the cases cited by the District. To the contrary, it is well established that once the District of Columbia has decided to install a traffic control device, it has a duty to properly maintain it. *Wagshal v. District of Columbia,* 216 A.2d 172, 174 (D.C.1966) (District could be held liable in negligence for failure to replace fallen stop sign, where such failure was proximate cause of subsequent collision.) Further, it also

seems clear to the Court that once the decision has been made that a particular intersection warrants installation of traffic signals, then a reasonable person would look upon their failure to operate as a presently dangerous condition, especially around the time of morning rush hour. Therefore, the District's duty to motorists could not be discharged merely by initiating an inherently time consuming maintenance procedure.

In *City of St. Petersburg v. Collom,* 419 So.2d 1082 (Fla.1982) the court stated, "[O]nce a governmental entity creates a *known* dangerous condition which may not be readily apparent to one who could be injured by that condition, and the governmental entity *has knowledge* of the presence of people likely to be injured, then the governmental entity must take steps to avert the danger or properly warn persons who may be injured by that danger." 419 So.2d at 1086 (emphasis in original). For example, if a city were to build a road with a sharp curve which planners know cannot be negotiated by a car traveling more than 25 miles per hour, then it has a duty to warn motorists of the hazard. 419 So.2d at 1086.

■ The Court sees very little difference, from a tort analysis standpoint, from the present case. A District employee knew there was a danger, having learned of it while patroling for defective traffic signals in the performance of his job. Yet he took no steps, or was not provided the means and instruction to take reasonable steps, to warn those motorists who would be passing through the intersection during the time the signals would necessarily be down. At the least, he could have been provided flares, or perhaps blockades to divert traffic from Kenyon (the smaller of the two streets) on to the next street over. Under the *City of St. Petersburg* doctrine, it seems to this Court that the District's duty to motorists who pass through an

vicariously liable for Strouse's torts, and since Strouse's negligence was not secondary or passive, but was active and primary in causing the accident. *Nordstrom v. District of Columbia,* 213 F.Supp. 315, 318–319 (D.D.C.1963) *rev'd on*

*other grounds,* 327 F.2d 863, 866–867 (D.C.Cir. 1963) (the Court of Appeals noting that indemnification is only proper where the gravity of the fault of the participants is so great as to throw the whole load upon one).

intersection after it is known to be hazardous is not lessened merely because of their fortuitous presence before repairs can be completed. The Court therefore finds that the District had a duty to warn approaching motorists of the danger, and negligently failed to do so.

In addition, the Court finds in its role as fact finder that the subsequent collision between Johnson and Strouse was a natural and foreseeable result of such failure to warn, and therefore a proximate cause. *See Wagshal v. District of Columbia,* 216 A.2d at 175 (jury could find that District's failure to repair stop sign was proximate cause of subsequent collision). The fact that the District had already determined the intersection required traffic signals is by itself evidence of proximate cause; the fact they were out with morning rush hour traffic approaching, and lighting conditions and visibility around the intersection far from ideal, leaves no doubt.

### 2. *Damages*

■ The remaining problem, which is somewhat knotty, is to determine what amount of damages the Strouses are entitled to receive from the District, in light of their settlement for $15,000 with PEPCO. The problem is complicated by the fact that the disposition of this case leaves undetermined the number of tort-feasors, and thus undetermined whether in principal the Strouses should be liable for one-half the Johnsons' damages, or one-third.

There appears to be no local case law on point. However, there is substantial guidance as to how much the *Johnsons* would have been entitled to from the Strouses and the District had *they* taken the case to trial after dismissing PEPCO for a $15,000 settlement, and this should give some indication as to the right result here.

First, it seems fair to assume that the Johnsons' total damages would have been assessed at $100,000 by a jury had their case gone to trial, since all parties to this action (plus PEPCO) agree that the Johnsons settlement for that amount from the Strouses was "fair and reasonable." Further, to assume any other figure would likely lead to an inequitable result as between the Strouses and the District, since $100,000 was the figure actually paid by the Strouses to the Johnsons.

Therefore assuming the Johnsons had been awarded $100,000 by a jury against the Strouses and the District of Columbia, the two tort-feasors would have been entitled to a reduction based on the Johnsons' hypothetical dismissal of PEPCO in exchange for a $15,000 settlement. *Snowden v. D.C. Transit System, Inc.,* 454 F.2d 1047, 1049 (D.C.Cir.1971). Further, since PEPCO's liability was not determined, the reduction would be $15,000 rather than one-third of total damages or $33,333.33. 454 F.2d at 1049. Thus, the Strouses and the District would be assessed $85,000, with each liable for a one-half of that or $42,500. *Early Settlers Insurance Co. v. Schweid,* 221 A.2d 920, 923 (D.C.1966). In summary, the Strouses and the District of Columbia would have contributed $42,500 each, and PEPCO $15,000, to the $100,000 awarded to the Johnsons.

There is no apparent reason to change this result here. The District contends it should pay the Strouses only $35,000 in contribution, reasoning that since the Strouses brought this lawsuit against it and PEPCO for contribution, and settled with PEPCO, then the District should be entitled to a credit for the amount of the settlement under *Snowden.* The District goes on to argue that such credit should be $15,000 applied to one-half the Strouses' settlement with the Johnsons, or $50,000.

But the *Snowden* doctrine, based on preventing unjust enrichment to plaintiffs who bring suit against multiple tortfeasors, and than settle with one before trial, does not apply so directly here. The *Snowden* doctrine assumes the plaintiff's total damages are determined at trial, thus providing a ceiling above which plaintiff's damage award plus settlement may not go. Here, no such ceiling can be determined for the Strouses' claim in contribution, since it remains undetermined how many tortfeasors there are. The District simply has no basis for saying that an award of $42,500 to the Strouses results in their unjust enrichment.

If the District for some reason had been prevented by the Strouses' settlement with PEPCO from suing PEPCO itself, there might be some force to arguing that requiring the District to contribute more than one-third unfairly penalizes it. *See Brightheart v. McKay*, 420 F.2d 242, 244 (D.C.Cir.1969). However, this does not appear to be the case here, and was not so argued by the District. Thus, by seeking to pay the Strouses only $35,000 in contribution, the District seeks to reap the full benefit of the Strouses' settlement with PEPCO on the one hand, while apparently having determined not to pursue a claim of its own against the utility on the other. *See Hall v. General Motors Corp.*, 647 F.2d 175, 185 (D.C.Cir.1980) ("GM had an opportunity to cross-claim [against the settling defendants] and passed it by. GM is therefore not comfortably situated to urge that we chart new law regarding reduction of judgments when an alleged joint tort-feasor settles.... In summary, GM presents no convincing justification for withholding from the [plaintiffs] full compensation for their injuries.") (citation omitted). It strikes the Court that the District of Columbia presents justification no more convincing for allowing either of the two proven tort-feasors here to pay less in damages than the other.

It shall therefore be the judgment of the Court that the third party defendant shall pay $42,500 in contribution to the third party plaintiffs.