**Alma D. WASHINGTON, et al., Appellants,**

v.

**WASHINGTON HOSPITAL CENTER, Appellee,**

**WASHINGTON HOSPITAL CENTER, Appellant,**

v.

**Alma D. WASHINGTON, et al., Appellees.**

**Nos. 89–829, 89–830.**

District of Columbia Court of Appeals.

Argued May 2, 1990.

Decided Aug. 3, 1990.

---

against the Washington Hospital Center (WHC or the hospital) in favor of LaVerne Alice Thompson, a woman who suffered permanent catastrophic brain injury from oxygen deprivation in the course of general anesthesia for elective surgery. Appellants, the mother and daughters of the injured woman, challenge the trial court's grant of summary judgment in favor of the defendant hospital on their claims for loss of consortium with Ms. Thompson. As we are bound by precedent holding such claims uncognizable in this jurisdiction, we affirm this aspect of the judgment without further discussion.[1]

On its cross-appeal, WHC challenges the denial of its motion for judgment notwithstanding the verdict, asserting that the opinion of the plaintiffs' expert—who testified that WHC had deviated from the standard of care by failing to supply a carbon dioxide monitoring device that would have permitted early detection of Ms. Thompson's oxygen deprivation—lacked an adequate factual basis. WHC further contends that the court abused its discretion in refusing to declare a mistrial as a result of a conversation during a bench conference between the plaintiffs' expert and two jurors, one of whom was hearing-impaired and communicated through interpreters using sign language. Finally, WHC asserts that the trial court erred in calculating a credit against the jury verdict reflecting a mid-trial settlement between the plaintiffs and certain other defendants, arguing that the hospital was entitled to a *pro rata* credit, or at least a *protanto* credit in the full amount of the settlement (not merely that portion received by LaVerne Thompson). For the reasons discussed below, none of these contentions is persuasive, and we affirm the judgments of the trial court.

David T. Smorodin, with whom Allen T. Eaton and W. David Allen, Washington, D.C., were on the brief, for appellants/cross-appellees Alma D. Washington (individually and as next friend and conservator for LaVerne Alice Thompson), Michael L. Thompson (individually and as natural guardian of Devin Michelle Thompson), Devin Michelle Thompson, and Toyia I. Green.

J. Joseph Barse, with whom James F. Jordan, David P. Durbin, and William M. Harter, Jr., Washington, D.C., were on the brief, for appellee/cross-appellant Washington Hosp. Center.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This appeal and cross-appeal arise from a jury verdict in a medical malpractice action

### I. *The Facts*

On the morning of November 7, 1987, LaVerne Alice Thompson, a healthy 36–

---

1. The parties agree that the decision of the United States Court of Appeals for the District of Columbia Circuit in *Pleasant v. Washington Sand & Gravel Co.*, 104 U.S.App.D.C. 374, 262 F.2d 471 (1958), forecloses claims for loss of consortium in favor of a parent or child of the injured party. Appellants assert that this case is anachronistic and contrary to more enlightened authority, and that we should overrule it. A division of this court cannot do so. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

year–old woman, underwent elective surgery at the Washington Hospital Center for an abortion and tubal ligation, procedures requiring general anesthesia. At about 10:45 a.m., nurse-anesthetist Elizabeth Adland, under the supervision of Dr. Sheryl Walker, the physician anesthesiologist, inserted an endotracheal tube into Ms. Thompson's throat for the purpose of conveying oxygen to, and removing carbon dioxide from, the anesthetized patient. The tube, properly inserted, goes into the patient's trachea just above the lungs. Plaintiffs alleged that instead Nurse Adland inserted the tube into Thompson's esophagus, above the stomach. After inserting the tube, Nurse Adland "ventilated" or pumped air into the patient while Dr. Walker, by observing physical reactions—including watching the rise and fall of the patient's chest and listening for breath sounds equally on the patient's right and left sides—sought to determine if the tube had been properly inserted.

At about 10:50 a.m., while the surgery was underway, surgeon Nathan Bobrow noticed that Thompson's blood was abnormally dark, which indicated that her tissues were not receiving sufficient oxygen, and reported the condition to Nurse Adland, who checked Thompson's vital signs and found them stable. As Dr. Bobrow began the tubal ligation part of the operation, Thompson's heart rate dropped. She suffered a cardiac arrest and was resuscitated, but eventually the lack of oxygen caused catastrophic brain injuries. Plaintiffs' expert testified that Ms. Thompson remains in a persistent vegetative state and is totally incapacitated; her cardiac, respiratory and digestive functions are normal and she is not "brain dead," but, according to the expert, she is "essentially awake but unaware" of her surroundings. Her condition is unlikely to improve, though she is expected to live from ten to twenty years.

Ms. Thompson's mother, Alma D. Washington, as next friend and conservator of Ms. Thompson's estate, brought a medical malpractice action on her behalf against Nurse Adland, Dr. Walker, Dr. Bobrow, Associated Anesthesiologist Services, P.C. (Adland's and Walker's employer), Wash-

ington Hospital Center, and Medlantic Health Care Group, Inc., a corporation affiliated with WHC. In addition, Alma Washington, in her individual capacity, Devin Michelle Thompson (through her father Michael Thompson) and Toyia Green, Ms. Thompson's daughters, sought damages for loss of consortium with Ms. Thompson. Finally, Michael Thompson, Ms. Thompson's estranged husband, asserted a claim for loss of spousal consortium. The defendants asserted no cross-claims or third-party complaints.

The plaintiffs alleged that Adland and Walker had placed the tube in Thompson's esophagus rather than her trachea, and that they and Dr. Bobrow had failed to detect the improper intubation in time to prevent the oxygen deprivation that caused Thompson's catastrophic brain injury. WHC, they alleged, was negligent in failing to provide the anesthesiologists with a device known variously as a capnograph or end-tidal carbon dioxide monitor which allows early detection of insufficient oxygen in time to prevent brain injury.

The defendants moved successfully for partial summary judgment on the authority of *Pleasant v. Washington Sand & Gravel Co., supra* note 1. The trial court also dismissed the claims against Dr. Bobrow without prejudice. Earlier, the plaintiffs had voluntarily dismissed the claims against Medlantic Health Care Group. Midway through the plaintiffs' case in chief, defendants Nurse Adland and Dr. Walker, and their insurer, settled the claims of all the plaintiffs against them. Thus, the case proceeded to the jury on Ms. Thompson's personal injury claim and her husband's loss of consortium claim against WHC alone. The jury returned a verdict of $4.586 million for Ms. Thompson and $63,-000 for her husband, Michael Thompson.

II. *Washington Hospital Center's Claims on Cross–Appeal*

A. Standard of Care

On its cross-appeal, WHC first asserts that the plaintiffs failed to carry their burden of establishing the standard of care and that the trial court therefore erred in

refusing to grant its motion for judgment notwithstanding the verdict.[2]

■ A trial court may enter a judgment notwithstanding the verdict "only when, viewing the evidence and reasonable inferences in the light most favorable to the party who secured the jury verdict, no juror could reasonably reach a verdict for the opponent of the motion." *District of Columbia v. White*, 442 A.2d 159, 163 n. 9 (D.C.1982), *quoting Webster v. M. Loeb Corp.*, 400 A.2d 319, 320 (D.C.1979). On appeal from a denial of the motion, our inquiry replicates that of the trial court. *See Ceco Corp. v. Coleman*, 441 A.2d 940, 944 (D.C.1982) (denial of directed verdict). *See also Oxendine v. Merrell Dow Pharmaceuticals*, 506 A.2d 1100, 1103 (D.C. 1986) (review of grant of judgment notwithstanding verdict).

■ In a negligence action predicated on medical malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury. *Ornoff v. Kuhn & Kogan, Chartered*, 549 A.2d 728, 731 (D.C.1988); *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 623–24 (D.C.1986). Because these issues are "distinctly related to some science, profession, or occupation," *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987), expert testimony is usually required to establish each of the elements, *Psychiatric Inst., supra*, 509 A.2d at 623–24 & n. 6; *Meek v. Shepard*, 484 A.2d 579, 581 & n. 4 (D.C.1984); *Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 368 (D.C.1980), except where the proof is so obvious as to lie within the ken of the average·lay juror, *see, e.g., Washington Hosp. Center v. Martin*, 454 A.2d 306, 309 (D.C.1982); *Harris v. Cafritz*

*Mem. Hosp.*, 364 A.2d 135, 137 (D.C.1976) (per curiam), *cert. denied*, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).

Generally, the "standard of care" is "the course of action that a reasonably prudent [professional] with the defendant's specialty would have taken under the same or similar circumstances." *Meek, supra*, 484 A.2d at 581. With respect to institutions such as hospitals, this court has rejected the "locality" rule, which refers to the standard of conduct expected of other similarly situated members of the profession in the same locality or community, *see Capitol Hill Hosp. v. Jones*, 532 A.2d 89, 93–94 (D.C.1987), in favor of a national standard. *Morrison v. MacNamara*, 407 A.2d 555, 565 (D.C.1979). Thus, the question for decision is whether the evidence as a whole, and reasonable inferences therefrom, would allow a reasonable juror to find that a reasonably prudent tertiary care hospital,[3] at the time of Ms. Thompson's injury in November 1987, and according to national standards, would have supplied a carbon dioxide monitor to a patient undergoing general anesthesia for elective surgery.

■ WHC argues that the plaintiffs' expert, Dr. Stephen Steen, failed to demonstrate an adequate factual basis for his opinion that WHC should have made available a carbon dioxide monitor. The purpose of expert opinion testimony is to avoid jury findings based on mere speculation or conjecture. *See Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C.1981); *District of Columbia v. Davis*, 386 A.2d 1195, 1201 (D.C.1978). The sufficiency of the foundation for those opinions should be measured with this purpose in mind.[4] WHC seeks to analogize Dr. Steen's testimony to that of the expert in *Toy v. District of Columbia*, 549 A.2d 1 (D.C.1988),

2. At appropriate points in the trial below, WHC also moved for a directed verdict on this ground, but here principally appeals the denial of its post-trial motions which included a motion for judgment notwithstanding the verdict.

3. Plaintiffs' expert defined a tertiary care hospital as "a hospital which has the facilities to conduct clinical care management of patients in nearly all aspects of medicine and surgery."

4. As noted in *Sponaugle v. Pre–Term, Inc., supra*, "[a]n expert opinion must be based on fact or adequate data. It is properly received so long as it is not a mere guess or conjecture. While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted." 411 A.2d at 367.

where the court upheld the trial court's grant of a motion for judgment notwithstanding the verdict against the plaintiff for failure to establish that the national standard of care required the District to maintain resuscitation equipment in the Traffic Division holding-facility where the plaintiff's husband hung himself.

In *Toy*, although the plaintiff's expert testified that he had reviewed two publications in preparation for his testimony, "he did not refer to these or any other written standards or authorities as support for his opinion regarding emergency equipment," but instead based his opinion of the general standard of care on his experience as Commissioner of the police department in Boston, where police stations had resuscitation equipment on hand near cell blocks. *Id.* at 8. The witness "gave no indication of how many police departments throughout the country have this type of equipment available in their police stations or holding cells," and we concluded that "[o]ne instance of a police department with emergency equipment is plainly insufficient to provide a factual basis for an expert opinion that the national standard of care requires police departments to maintain resuscitation equipment." *Id.*

WHC contends that the expert testimony in *Toy* "is, for all practical purposes, identical to that of Dr. Steen in the instant case." It asserts that, like the witness there, Steen gave no testimony on the number of hospitals having end-tidal carbon dioxide monitors in place in 1987, and that he never referred to any written standards or authorities as the basis of his opinion. We conclude that Steen's opinion rested upon a broader foundation than the expert's in *Toy*, and that combined with the other evidence concerning standard of care, it was sufficient to create an issue for the jury.

Dr. Steen testified that by 1985, the carbon dioxide monitors were available in his hospital (Los Angeles County—University of Southern California Medical Center (USC)), and "in many other hospitals." In response to a question whether, by 1986, "standards of care" required carbon dioxide monitors in operating rooms, he replied,

"I would think that by that time, they would be [required]." As plaintiffs concede, this opinion was based in part on his own personal experience at USC, which, under *Toy*, cannot itself provide an adequate foundation for an expert opinion on a national standard of care. But Steen also drew support from "what I've read where [the monitors were] available in other hospitals." He referred to two such publications: The American Association of Anesthesiology (AAA) Standards for Basic Intra–Operative Monitoring, approved by the AAA House of Delegates on October 21, 1986, which "encouraged" the use of monitors, and an article entitled *Standards for Patient Monitoring During Anesthesia at Harvard Medical School,* published in August 1986 in the Journal of American Medical Association, which stated that as of July 1985 the monitors were in use at Harvard, and that "monitoring end-tidal carbon dioxide is an emerging standard and is strongly preferred."

■ WHC makes much of Steen's concession on cross-examination that the AAA Standards were recommendations, strongly encouraged but not mandatory, and that the Harvard publication spoke of an "emerging" standard. In its brief WHC asserts, without citation, that "[p]alpable indicia of widespread *mandated* practices are necessary to establish a standard of care" (emphasis added), and that at most the evidence spoke of "recommended' or "encouraged" practices, and "emerging" or "developing" standards as of 1986–87. A standard of due care, however, necessarily embodies what a *reasonably prudent* hospital would do, *see Meek, supra,* 484 A.2d at 581, and hence care and foresight exceeding the minimum required by law or mandatory professional regulation may be necessary to meet that standard. It certainly cannot be said that the 1986 recommendations of a professional association (which had no power to issue or enforce mandatory requirements), or an article speaking of an "emerging" standard in 1986, have no bearing on an expert opinion as to what the standard of patient monitoring equipment was fully one year later when Ms. Thompson's surgery took place.

Nevertheless, we need not decide whether Dr. Steen's testimony was sufficiently grounded in fact or adequate data to establish the standard of care. The record contains other evidence from which, in combination with Dr. Steen's testimony, a reasonable juror could fairly conclude that monitors were required of prudent hospitals similar to WHC in late 1987. The evidence showed that at least four other teaching hospitals in the United States used the monitors by that time. In addition to Dr. Steen's testimony that USC supplied them and the article reflecting that Harvard University had them, plaintiffs introduced into evidence an article entitled *Anesthesia at Penn*, from a 1986 alumni newsletter of the Department of Anesthesia at the University of Pennsylvania, indicating that the monitors were then in use at that institution's hospital, and that they allowed "instant recognition of esophageal intubation and other airway problems...." Moreover, WHC's expert anesthesiologist, Dr. John Tinker of the University of Iowa, testified that his hospital had installed carbon dioxide monitors in every operating room by early 1986, and that "by 1987, it is certainly true that many hospitals were in the process of converting" to carbon dioxide monitors.[5]

Perhaps most probative was the testimony of WHC's own Chairman of the Department of Anesthesiology, Dr. Dermot A. Murray, and documentary evidence associated with his procurement request for carbon dioxide monitors. In December 1986 or January 1987, Dr. Murray submitted a requisition form to the hospital for end-tidal carbon dioxide units to monitor the administration of anesthesia in each of the hospital's operating rooms, stating that if the monitors were not provided, the hospital would "fail to meet the national standard of care." The monitors were to be "fully operational" in July of 1987.[6] Attempting to meet this evidence, WHC points out .that at trial

> Dr. Murray was *never asked to opine,* with a reasonable degree of medical certainty, that the applicable standard of care at the relevant time *required* the presence of $CO_2$ monitors. Indeed, his testimony was directly to the contrary. Moreover, the procurement process which he had initiated envisioned obtaining the equipment ... over time, not even beginning until fiscal year 1988, a period ending June 30, 1988. [Emphasis by WHC.]

Dr. Murray opined that in November 1987 there was *no* standard of care relating to monitoring equipment. The jury heard this testimony and Dr. Murray's explanation of the procurement process, but apparently did not credit it, perhaps because the requisition form itself indicated that the equipment ordered was to be operational in July 1987, four months before Ms. Thompson's surgery, and not at some unspecified time in fiscal year 1988 as Dr. Murray testified at trial.

On the evidence recited above, a reasonable juror could find that the standard of care required WHC to supply monitors as of November 1987. The trial judge therefore did not err in denying the motion for judgment notwithstanding the verdict.

---

5. In its reply brief, WHC argues that
   the fact that four teaching hospitals used $CO_2$ monitors during the relevant time period is almost irrelevant. Institutions with significantly enhanced financial resources and/or government grants which accelerate their testing and implementation of new and improved technologies would naturally have available to them items which, inherently, were not yet required for the general populace of hospitals.
   In fact, Dr. Steen, in voir dire examination on his qualification as an expert on the standard required of hospitals in WHC's position in regard to equipment, testified that his review of WHC's President's Report for 1986–87 led him to conclude that WHC was a teaching hospital.

Counsel for the hospital could have identified and probed fully before the jury any differences between WHC and the hospitals relied on to establish the standard of care. To the extent the record was not so developed, the jury could credit Steen's testimony that WHC was required to adhere to the standard applicable to teaching hospitals.

6. As supporting documentation for the requisition, Dr. Murray attached a copy of the Journal of the American Medical Association article on standards at Harvard University. The requisitions, with attachments, were exhibits admitted in evidence.

### B. The Witness–Juror Contact

On March 10, 1989, during a bench conference, the juror in seat number one struck up a conversation with Dr. Steen, whom the judge had instructed to step down from the witness stand. The hearing-impaired juror, in seat number eight, apparently also participated in the conversation through her signing interpreters. Defense counsel observed this exchange and called it to the trial judge's attention. The judge immediately excused the jury and conducted an extensive, on-record examination of Dr. Steen, juror number one, the hearing-impaired juror, and her interpreters. With the agreement of all parties, the judge struck juror number one, who never returned to the jury room. The examination revealed that the conversation had lasted five minutes. Juror number one had begun it by asking Dr. Steen where he had attended medical school, and about the weather in California. Through her signing interpreter, juror number eight took part in the conversation, asking what country Dr. Steen was from and about his experiences in World War II.

WHC's claims of prejudice principally arise from the testimony of Carla Mathers, one of the interpreters, that juror number one asked Dr. Steen if this was the first time he had been in court, and he responded that he "usually gets the cases [that] settle before they get to court." In his examination, Dr. Steen did not mention the comment about settlement, but after being recalled and confronted with Ms. Mathers' statement, conceded that it was "possible" he had said the cases in which he had been involved usually settled. The judge questioned the hearing-impaired juror to learn whether she had seen any sign language that might impede her ability to serve impartially. Crediting the juror's statement that she did not understand Dr. Steen to have said anything about prior cases, the judge concluded she had not heard anything about settlement of cases, and had not been "tainted." [7] He therefore denied the defendants' motions to strike her as a witness and for a mistrial. To decide whether action beyond striking juror number one was needed, the judge asked the rest of the jurors for a show of hands to determine whether any had seen or participated in the conversation. None had.

WHC asserts that the judge's failure to strike the hearing-impaired juror or to ask any of the jurors whether, despite the conversation, they could still render an impartial verdict necessitates a new trial. We disagree. In *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), the Supreme Court held that "[p]rivate communications, possibly prejudicial, between jurors and ... witnesses ... are absolutely forbidden, and invalidate the verdict, at least *unless their harmlessness is made to appear.*" *Id.* at 150, 13 S.Ct. at 53 (emphasis added). Thus, although im-

---

7. The transcript of the hearing-impaired juror's testimony, given through her interpreter, reads:

> COURT: Did the witness ever say anything about any other cases the witness had been on?
> INTERPRETER: I don't know. I have no idea. I didn't see if he did.
>
> * * * * * *
>
> COURT: Was there any discussion about whether the witness had ever been in court before or testified in court before?    .
> INTERPRETER: That was something he said himself.
> COURT: What did he say himself in that regard?
> INTERPRETER: He said this is the first time I was in court here and came here Sunday and then that was it.
> COURT: Did he say anything about what usually happens in the cases he's involved in?
> INTERPRETER: I don't know. I didn't see that. Perhaps the interpreter or this woman here in the front might have heard that, but I didn't.

Later, to resolve the inconsistency between Ms. Ghee's and Mathers' testimony that she had signed this part of the conversation to Ghee, the judge recalled Mathers and asked her:

> COURT: Is the concept of settling, which you would have had to convey in your signing to Ms. Ghee, is that a difficult concept to impart to a hearing-impaired person?
> INTERPRETER MATHERS: Yes, and had I been interpreting in a proceeding, I would have done it differently, I did a very common sign that doesn't mean settle in the legal sense. It means to settle down, really. Had I been interpreting there would have been a lot more context there to explain what settlement means before going to—so you avoid having a trial.

proper juror contact is presumptively harmful, *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), a party claiming prejudice from such contact is not entitled to a mistrial without more. Rather, the remedy for allegations of juror bias is a hearing to determine whether the misconduct actually resulted in prejudice. *Smith v. Phillips*, 455 U.S. 209, 215–17, 102 S.Ct. 940, 944–46, 71 L.Ed.2d 78 (1982). *See Catlett v. United States*, 545 A.2d 1202, 1213 (D.C.App.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989); *Shannon & Luchs Management Co. v. Roberts*, 447 A.2d 37, 41 (D.C.App.1982). Following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, *id.* at 43, and the findings of fact underlying that determination are entitled to "great deference." *Brooks v. United States*, 536 A.2d 1091, 1096 (D.C.1988).

There was no abuse of discretion here. The trial judge heard ample testimony to rebut any inference of prejudice, and enough to support his finding that none of the jurors except juror number one had been tainted. First, the judge determined that the conversation for the most part was "innocuous", in that it related to matters such as the weather, Greenland, and World War II that had no bearing on the case. Second, after striking juror number one, the judge determined that only jurors number one and eight had seen, heard or participated in any part of the conversation, thus negating any taint on the part of the other jurors, who were unaware of the conversation until the judge told them of it.[8] Finally, the judge learned—and so found—that

juror number eight had heard nothing about settlement of cases.

In these circumstances, asking the hearing-impaired juror and the remaining jurors whether they could render a fair and impartial verdict would have been unnecessary at best, and at worst risked calling undue attention to the incident. *See United States v. Butler*, 262 U.S.App.D.C. 129, 134, 822 F.2d 1191, 1196 (1987) ("trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence").[9] The judge handled the matter sensitively and correctly.

### C. Reduction of the Jury Verdict

The trial judge reduced Ms. Thompson's $4.5 million jury verdict *pro tanto* by $1.38 million to reflect the fact that the other two alleged tortfeasors—the anesthesiologist, Dr. Walker, and the nurse-anesthetist, Nurse Adland—had agreed to settle Ms. Thompson's claims for that amount midway through trial. WHC asserts that the judge instead should have reduced the verdict on a *pro rata* basis according to the number of settling versus non-settling defendants, here by two-thirds.[10] We therefore must revisit a distinction that has proved vexing in prior decisions.

Both parties to this appeal acknowledge the settled rule that a *pro rata* reduction is only appropriate in circumstances where the settling defendants are determined to be tortfeasors otherwise liable. *See Martello v. Hawley*, 112 U.S.App.D.C. 129, 132,

---

8. In its brief, WHC insists that the trial judge erred in not questioning each and every one of the jurors individually because "all of the jurors undoubtedly became aware of the nature and substance of the conversation between Dr. Steen and the jurors." This speculative assertion—for which WHC offers no record support—conflicts with the trial judge's finding that none of the jurors other than numbers one and eight had ever heard or observed the conversation.

9. Moreover, WHC arguably waived the claim of inadequate inquiry as to the jury at large when it agreed with the trial judge that, if in fact the

jury had not heard the conversation, they should not be instructed on the impropriety of witness/juror contact. Asking jurors whether they could render an impartial verdict despite a conversation they had not heard amounts to the very same thing.

10. As used here and in our decisions, *pro tanto* refers to a dollar-for-dollar credit against the jury verdict in the amount of the settlement. *Pro rata* refers to a proportional credit, based on the number of settling defendants versus non-settling defendants.

300 F.2d 721, 724 (1962). In the absence of a determination of the settling defendants' liability *vel non*, both agree the credit is *pro tanto*. *See Crooks v. Williams*, 508 A.2d 912, 915 (D.C.1986); *Snowden v. District of Columbia Transit Sys.*, 147 U.S. App.D.C. 204, 205–06, 454 F.2d 1047, 1048–49 (1971).

The parties differ, however, on whether WHC's failure to request a finding of liability of the settling defendants or to file a cross-claim for contribution against any of them defeated its claim for a *pro rata* reduction. They also disagree, less vigorously, on whether that finding must be made by the jury rather than by the court. In keeping with the *Martello* credit's origin as a substitute for a claim for contribution against a negligent codefendant, we agree with plaintiffs that, although the trial court may resolve the issue of the settling defendant's negligence in connection with a cross-claim for contribution, WHC's failure to keep that issue in the case by asserting a claim for contribution—either through a cross-claim or by a special jury verdict request—precludes application of a *pro rata* credit.

In *Martello, supra,* the United States Court of Appeals for the District of Columbia Circuit held:

> [I]n the factual circumstances of this case[,] ... when settlement is made with one joint tort-feasor and later a verdict is obtained against the other, and the jury finds that the settling tort-feasor should contribute, then the verdict should be credited with one-half its total amount and the defendant tort-feasor should be required to pay only the remaining balance, namely, one-half the total original verdict.

112 U.S.App.D.C. at 132, 300 F.2d at 724. The "factual circumstances" of *Martello* included these: the non-settling defendant "by third-party complaint ... asked judgment against Caughman [the settling tort-feasor] 'for all or a contributable portion of any judgment rendered against them'"; the jury found in favor of the *Martellos* against Caughman for contribution; and the parties stipulated that the amount of

contribution "should be set by the court." *Id.* at 130, 300 F.2d at 722. Indeed, as originally conceived, the *Martello pro rata* credit was closely linked with a non-settling defendant's right to contribution, and accommodated interests "not readily susceptible of reconciliation with each other," *id.* at 131, 300 F.2d at 723:

> Contribution is a right existing among joint tort-feasors based upon the theory that, as each tort-feasor was at fault in bringing about the injury to the innocent party, then in justice each tort-feasor should share his part in the burden of making the injured party whole again. Moreover, as there is no doctrine of comparative negligence in the District of Columbia, there is much to be said for the proposition that this burden should be shared equally by those at fault. However, superimposed upon this theoretically equitable formula is the rule that an injured plaintiff may settle with one or more of the negligent tort-feasors without thereby surrendering the right to recover against the others.

*Id.* Anything but a *pro rata* reduction in such circumstances, the court reasoned, would allow a settlement to defeat the non-settling joint tortfeasor's right to recover a full measure of contribution, *id.*, which otherwise could not be vindicated without undermining the "policy of according protective finality to out-of-court settlements by tort-feasors." *Id.* at 130, 300 F.2d at 722.

In *Snowden v. District of Columbia Transit Sys., supra,* the Circuit Court refused to apply a *pro rata* credit in circumstances where the jury expressly found the settling defendant not liable, both on the principal claim and on her codefendant's claim for contribution. (The jury was not informed of the settlement, and the case proceeded as if it had not occurred). The court reasoned, however, that a *pro tanto* credit was appropriate because the plaintiff had suffered but one injury, and was not entitled to recover more than full satisfaction. In rejecting the plaintiff's argument that the rule "barring *contribution* where there is *no finding of joint liability in tort* preclude[s] a *credit* where liability is not joint" (emphasis in original), the court em-

phasized fundamental difference between the non-settling defendant's right to contribution and the *pro tanto* credit it recognized which ensured that the plaintiff received no more than full satisfaction. 147 U.S.App.D.C. at 206 & n. 6, 454 F.2d at 1049 & n. 6.

In *Hall v. General Motors Corp.*, 207 U.S.App.D.C. 350, 647 F.2d 175 (1980), the court rejected a claim by a non-settling defendant to a *Martello* credit, upholding the trial court's application of a *pro tanto* reduction. Unlike *Snowden*, where the plaintiff's claim and the non-settling defendant's cross-claim for contribution against the settling defendant were put to the jury as if the settlement had not occurred, in *Hall*, after a pretrial settlement, the plaintiff's claim against the settling defendant was dismissed with prejudice, as was the settling defendant's cross-claim for indemnification against General Motors. Significantly, General Motors had filed no cross-claim for contribution of its own against the settling defendant. The court emphasized the failure of the non-settling defendant to cross-claim for contribution, and the fact that the dismissal of the principal claim against the settling defendant left his joint liability an open question:

> We conclude that GM received the appropriate credit in this action and is not entitled to more. First, it is not at all clear that the settlement stripped GM of a right to contribution which it otherwise would have had. Second, no District of Columbia case recognizes a right to a pro rata (50%) reduction of a plaintiff's judgment against a nonsettling defendant when a settling defendant's liability *vel non* has not been determined. Finally, if GM wished to safeguard any legitimate claim it might have to lessen the burden of a plaintiffs' burden, a cross-claim against Larry Buick was available to it.

*Id.* at 358–59, 647 F.2d at 183–84.

In *Crooks v. Williams, supra*, this court cited *Hall* with approval in upholding a *pro tanto* credit where the defendant hospital and the plaintiff had settled before trial and a medical malpractice claim proceeded against a doctor. The court found no error

in the refusal of a *pro rata* credit, concluding that "[w]here, as here, the settling defendant's liability *vel non* has not been determined, the granting of a *pro tanto* credit is proper." 508 A.2d at 915. In *Otis Elevator Co. v. Henderson*, 514 A.2d 784 (D.C.1986), the court made quite clear that part of the predicate for a *Martello* credit was the non-settling defendant's assertion of a cross-claim for contribution against the settling defendant. The court stated the rule as follows:

> A judgment is to be reduced by half where the plaintiff sues purported joint tortfeasors and one settles, *but remains a party to the action because one of the other defendants has submitted a cross-claim for contribution, and* the settling tortfeasor is found by the jury to have been negligent.

*Id.* at 786 (emphasis added). The court cited a footnote in *Kassman v. American Univ.*, 178 U.S.App.D.C. 263, 267 n. 24, 546 F.2d 1029, 1033 n. 24 (1976), encapsulating the rationale for the *pro rata* credit: "pro rata reductions [are] permissible only where one tortfeasor would be able to compel contribution, but for the plaintiff's settlement with another tortfeasor." Hence, the court concluded that only a *pro tanto* credit was appropriate because "Otis never cross-claimed against [U.S.] Food's for contribution, and neither jury nor judge considered whether or not Food's was liable for Henderson's injuries." *Id.* at 786.

Against this background of the origins and purposes of a *Martello* credit, we view a *pro rata* credit as a substitute for the non-settling defendant's actual claim for contribution that persists after the dismissal of the principal claim against a settling defendant—and not simply as an incident of the existence of an abstract *right* to contribution never asserted. Although a finding of joint liability is central, because "[a] claim for contribution will lie only if the defendant is liable, concurrently with the original defendant, to the plaintiff in the original suit," *Group Health Ass'n v. District of Columbia General Hosp.*, 540 A.2d 1104, 1106 (D.C.1988), *Hall* and *Otis* emphasize the non-settling defendant's assertion of the settling defendants' negli-

gence and of its right to contribution *before* the jury returns a verdict. Here, WHC had many opportunities to do so, but never raised the question of the other defendants' liability until it filed post-trial motions seeking a *Martello* credit.[11] WHC reasonably could have been expected to "safeguard any legitimate claim it might have to lessen the burden of a plaintiff's verdict," *Hall, supra,* 207 U.S.App.D.C. at 359, 647 F.2d at 184, by asserting a cross-claim for contribution, as did the non-settling defendants in *Martello,* or an equivalent request for a determination by the jury of the settling defendants' negligence.

Unlike a typical claim for contribution among joint tortfeasors, the *Martello* credit's consequences are visited upon the plaintiff. As the court noted in *Lamphier v. Washington Hosp. Center,* 524 A.2d 729 (D.C.1987), to protect the finality of out-of-court settlements, "the injured party in settling with one tortfeasor effectively bears the burden that otherwise would fall upon the settling tortfeasor to make contribution...." *Id.* at 733. Allowance of a *Martello* credit in circumstances where the non-settling defendant has not made a claim for contribution leads a plaintiff who has settled with certain defendants to believe issues of their liability have been removed from the case, only to find these questions revived after a verdict has been returned. Had WHC asserted that Dr. Walker and Nurse Adland were negligent, the record likely would have developed quite differently than it did, partic-

ularly because plaintiffs were obliged under the settlement agreement to hold the settling defendants harmless against any claim for contribution or indemnity by WHC. *See* note 11, *supra.* Plaintiffs would have had every incentive to argue that Walker and Adland did not deviate from the standard of care.[12] While the plaintiff in this situation risks losing credibility in the jury's eyes—having asserted before settlement that all defendants were liable, only to shift theories and endeavor to lay all fault at the feet of the remaining defendant—this problem is a function of the timing of the settlement, a matter principally within the control of the defendants, who have had the benefit of observing the strength of the plaintiffs' case against them. Whether the settlement occurs before trial or during it, a plaintiff facing possible application of a *Martello* credit should have fair notice that the non-settling defendant plans to seek a *pro rata* reduction of the verdict on the ground that his settling counterparts were negligent, and an opportunity to build a rebuttal case. *See Washington Healthcare Corp. v. Barrow,* 531 A.2d 226, 230 (D.C.1987) (non-settling defendant "had full opportunity and strong motivation to develop the record regarding [settling defendant's] role, and did so"). The plaintiffs here were denied that notice and opportunity.[13]

WHC further argues that the absence of either findings on the settling defendants' liability or an opportunity by plaintiffs to fully litigate that issue is harmless because

---

11. The settlement with the other defendants was entered mid-way through the plaintiffs' case in chief. It contained a provision whereby the plaintiffs agreed to indemnify and hold harmless the settling defendants from any

> claims which may hereafter be made by the Washington Hospital Center against these Settling Defendants individually and/or jointly, by way of contribution and/or indemnification as to any and all sums which may be paid by or adjudged against the Washington Hospital Center in Civil Action Number 10616-87.

Despite the fact that the settling defendants contemplated a claim for contribution by WHC, WHC took no steps to assert one against those defendants—before or after the settlement—until asserting a right to a *pro tanto* reduction of the verdict.

12. Alternatively, the settling defendants might have chosen to defend actively against the cross-claim of negligence rather than rely on plaintiffs to plead their cause.

13. If a claim for contribution by WHC had been pending after the jury returned its verdict, the trial judge would have possessed authority to decide the joint liability of the settling defendants *vel non,* as "the claim sounds in equity and the court acts as the finder of fact to determine whether the second tortfeasor from whom contribution was sought was negligent." *Jones v. Schramm,* 141 U.S.App.D.C. 169, 171, 436 F.2d 899, 901 (1970). *See Washington Healthcare Corp. v. Barrow, supra,* 531 A.2d at 230 n. 2 (dictum) (trial court may resolve cross-claim for contribution after jury returns verdict when equitable claims underlie it).

the facts were such that those defendants would be liable as a matter of law. In *Barrow, supra,* the court excused the trial court's failure to make findings on the issue of a settling defendant doctor's liability because the issue could be resolved essentially as a matter of law. 531 A.2d at 230. We found no record evidence to suggest that the doctor ever received the report containing information he was alleged to have negligently failed to furnish the injured patient. Relying on this part of *Barrow,* WHC argues that a finding of negligence against the hospital necessarily encompassed a finding of negligence against the attending anesthesiologist and the nurse who inserted the tube. That is not so. First, both Walker and Adland expressly denied liability in the settlement agreement. *See Otis, supra,* 514 A.2d at 786. More importantly, Dr. Steen, plaintiffs' own expert, testified on cross-examination that an improper intubation was so common that it might not be a violation of the standard of care. According to Dr. Steen, even when the doctor and nurse do everything the standard of care requires in the way of physical examination to detect an esophageal intubation (listening to breathing sounds, checking the tube for

vapor, etc.), competent professionals can be "tricked", and hence mechanical monitors are necessary. If it credited plaintiffs' expert, the jury could have found the hospital negligent without finding Dr. Walker or Nurse Adland negligent.

■ Finally, we reject WHC's "judicial estoppel" argument that the plaintiffs, having asserted in their pleadings that all defendants were negligent, should not be heard on appeal to deny the negligence of the settling defendants. In light of the requirement of our cases that the settling defendants' liability be *judicially established, Lamphier, supra,* 524 A.2d at 733 & n. 5, we decline to hold that allegations in pleadings can replace findings of fact for purposes of applying a credit against the verdict intended to substitute for the non-settling defendant's contribution claim.[14]

■ Offering as support little more than "considerations of equity," WHC asserts that even if the court correctly applied a *pro tanto* rather than a *pro rata* credit, the verdict should have been reduced by the full $2 million present value of the settlement—reflecting amounts given in settlement of the claims of Alma Washington, Devin Michelle Thompson,

---

14. To the extent that decisions from other jurisdictions may rely on the pleadings alone to estop the plaintiffs from denying that all defendants were liable in tort as a substitute for a judicial determination of liability, *see, e.g., Levi v. Montgomery,* 120 N.W.2d 383 (N.D.1963); *Degen v. Bayman,* 90 S.D. 400, 241 N.W.2d 703 (1976); *Rosenbaum v. First Am. Nat'l Bank,* 690 S.W.2d 873 (Tenn.Ct.App.1985), they are inconsistent with *Lamphier.* In any event, these decisions arose in contexts distinguishable from the instant case. In *Degen,* the Supreme Court of South Dakota did not rely exclusively on the allegations in the plaintiff's pleadings, but also on its own earlier conclusion, in connection with the settling defendant's claim for indemnification against the non-settling defendant, that the settling defendant was a tortfeasor. 90 S.D. at 407–409, 241 N.W.2d at 707. In *Levi,* while the court held that the plaintiff's pleadings determined whether a settling defendant was a "tortfeasor", it did so for purposes of applying a statutory provision requiring a *pro tanto* reduction of a jury verdict against a non-settling defendant, and reached this result to avoid "allow[ing] the plaintiff to recover in full for all damages suffered by him, and to retain the sum paid for the covenant not to sue." 120 N.W.2d

at 389, *cited with approval in Rosenbaum v. First Am. Nat'l Bank, supra,* 690 S.W.2d at 878.

As noted previously, in this jurisdiction, as in those employing the "estoppel" theory urged by WHC, it is unnecessary that the settling defendant be branded a "tortfeasor" to avoid the injustice of a double recovery, because a *pro tanto* credit in the amount of the settlement applies even if the settling defendant is found *not* to be a tortfeasor, *see Crooks, supra,* 508 A.2d at 914; *Snowden, supra,* 147 U.S.App.D.C. at 206, 454 F.2d at 1049. Indeed, for purposes of the *pro tanto* credit, the *Levi* court noted, "[t]he question of actual liability in tort of any of the defendants ... discharged by release and covenant not to sue is wholly immaterial." 120 N.W.2d at 389. By contrast, the question whether the verdict will be reduced *pro rata* relates directly to the non-settling defendant's claim for contribution, which will lie only if the defendant is jointly liable to the plaintiff. *Group Health Ass'n v. District of Columbia General Hosp., supra,* 540 A.2d at 1106. Here, unlike in *Levi, Degen,* and *Rosenbaum,* the plaintiffs do not seek to avoid application of a *pro tanto* credit by making the somewhat implausible argument that the settlement was a "gift."

and Toyia Greene, as opposed to the amount attributable only to Ms. Thompson's claims. The trial judge refused to aggregate the amounts received in settlement of individual claims of the other plaintiffs to reduce the verdict in favor of LaVerne Thompson, and reduced the verdict only by the $1.328 million she received in settlement of her individual claims.

█ The rationale behind the *pro tanto* credit, as explained earlier, is to ensure that the plaintiff receives no more than the loss actually suffered for her claim. *Snowden, supra*, 147 U.S.App.D.C. at 205–06, 454 F.2d at 1048–49. This purpose would not be served by reducing the verdict in favor of one plaintiff to reflect amounts received by others in settlement of their claims. We recognize the risk, to which WHC points, that in a case such as this plaintiffs may attempt to shield portions of a settlement from an eventual *pro tanto* credit by shifting to the settlement of one plaintiff amounts properly attributable to the injuries of another. The trial judge, however, addressed this issue squarely, finding that despite the binding authority of *Pleasant, supra* note 1, "the claims on behalf of Alma Washington, Toyia Green and Devin Thompson were brought in good faith" and similarly that there was no evidence that "the settling defendants were not acting in good faith and with a genuine interest to protect themselves from future claims by these plaintiffs that might be vindicated through the appellate process...." The judge did not err in refusing to credit WHC for the amounts that settled claims of plaintiffs other than LaVerne Thompson.[15]

*Affirmed.*

15. WHC's remaining contention is that the trial judge should have set off Ms. Thompson's outstanding $600,000 hospital bill against the verdict, because plaintiffs' counsel adduced evidence of it and argued it to the jury as part of their case on damages. In its post-trial ruling, the trial judge refused to award a set-off because the Hospital had never asserted a claim to it— either as a set-off proper or as a counterclaim, or even as a request for a special verdict interrogatory—during the course of the trial. We agree with the judge's reasoning. Moreover, as the trial judge noted, WHC is free to pursue its claim for the hospital bill against Ms. Thompson and her conservator in a separate proceeding.