**James G. KANE, M.D., Appellant,**

v.

**Janet RYAN, et al., Appellees.**

**No. 90–756.**

District of Columbia Court of Appeals.

Argued June 18, 1991.

Decided Sept. 4, 1991.

---

Gary A. Godard, with whom Kenneth J. Barton, Jr., Fairfax, Va., was on the brief, for appellant.

Lawrence S. Lapidus, Washington, D.C., for appellees.

Before FERREN and SCHWELB, Associate Judges, and MACK, Senior Judge.

FERREN, Associate Judge:

A jury awarded appellee Janet Ryan $1,150,000 and her husband, appellee George Ryan, $150,000 for Dr. James G. Kane's failure to diagnose and treat Ms. Ryan's Systemic Lupus Erythematosus, which resulted in an hemorrhagic stroke. Appellant, Dr. Kane, contends that the Ryans (1) failed to produce sufficient evidence of proximate cause, and that the trial court erred (2) in allowing certain expert economic testimony about Ms. Ryan's future lost income, (3) in limiting Dr. Kane's cross-examination for bias of one of the Ryans' experts, and (4) in refusing to grant a *pro rata*, rather than *pro tanto*, credit for pretrial settlement with the co-defendant, Dr. Robert M. Adrian. We affirm.

In September 1985, Ms. Ryan's gynecologist asked Dr. Kane to examine Ms. Ryan's swelling leg while she was at Sibley Hospital. Dr. Kane found blood clots and prescribed Coumadin, a blood thinner. Dr. Kane also asked a dermatologist, Dr. Adrian, to examine a pink rash covering parts of Ms. Ryan's body. Dr. Adrian examined

Ms. Ryan and concluded that the rash was caused either by a drug allergy or by the sun. Dr. Kane treated Ms. Ryan seven times between September 1985 and February 1986, including treatment during a re-hospitalization at Sibley beginning November 7, 1985.

In March 1986, Dr. Kane received a biopsy report showing symptoms from which he concluded that Ms. Ryan had Cutaneous Lupus, although he suspected she might have Systemic Lupus Erythematosus (S.L.E.).[1] Dr. Kane, however, did not consult with a lupus specialist about Ms. Ryan's condition. Dr. Kane discussed Ms. Ryan's symptoms with Dr. Adrian in mid-March, when Dr. Adrian assured him that Ms. Ryan's problems were strictly dermatologic. Dr. Kane checked Ms. Ryan again on April 16 and May 14, 1986. On July 9, 1986, Dr. Kane advised her over the telephone to stop taking Coumadin. On September 4, 1986, Ms. Ryan returned to Dr. Adrian complaining of red lumps on her legs and arms. Dr. Adrian said he would check her blood and call her (the record does not reveal whether Dr. Adrian called Ms. Ryan about the test). On October 9, 1986, Ms. Ryan was admitted to Georgetown University Hospital after suffering a stroke. After several months in the hospital, she returned home where she remains brain impaired, having lost 40 IQ points.

The Ryans brought this jury action claiming that Dr. Kane and Dr. Adrian negligently failed to diagnose and treat Ms. Ryan's pre-stroke symptoms. Dr. Kane filed a cross-claim against Dr. Adrian alleging that, as the last doctor to see Ms. Ryan, Dr. Adrian should have diagnosed her S.L.E. The cross-claim was tried before the trial court. On the first day of trial, the Ryans settled with Dr. Adrian for

$300,000. After trial, the jury awarded Ms. Ryan $1,150,000 against Dr. Kane for negligence and awarded Mr. Ryan $150,000 for loss of consortium. Thereafter, the trial court ruled in Dr. Adrian's favor on the cross-claim. The court then applied a *pro tanto* credit of $300,000 (representing the amount of the settlement with Dr. Adrian) to the overall verdict and granted judgment against Dr. Kane for $1,000,000. On May 7, 1990, the trial court denied Dr. Kane's motions for judgment notwithstanding the verdict, a new trial, a remittitur, or a pro-rata credit. This appeal followed.

## I.

■ Dr. Kane argues that the evidence of proximate cause was insufficient to sustain the jury verdict. We review the appeal of a denial of a motion for judgment notwithstanding the verdict by viewing the evidence in the light most favorable to the non-moving party. We reverse only if no reasonable juror could have reached the verdict. *See Jackson v. Condor Mgmt. Group, Inc.*, 587 A.2d 222, 224 (D.C.1991); *District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C.1983) (per curiam).

## A.

■ Dr. Kane contends that because the trial court found insufficient evidence of proximate cause on the cross-claim, the court erred in denying his motion for judgment notwithstanding the verdict. The trial court, in ruling for Dr. Adrian, found:

[T]he credible evidence was that the stroke could not have been prevented. I simply disagree with what must have been the jury's verdict in this respect.

Dr. Kane testified that the difference between Systemic Lupus Erythematosus and Cutaneous Lupus (Subcutaneous Lupus Erythematosus) is "huge" and "tremendous." Apparently, Cutaneous Lupus is considerably less threatening than Systemic Lupus Erythematosus because, according to Dr. Kane, of the patients with Cutaneous Lupus, less than five percent have any further medical trouble from that disease four or five years later, whereas Dr. Jack Rabin, a plaintiff's expert, testified that Systemic Lupus Erythematosus, if untreated, is frequently fatal.

1. Dr. Gale McCarty, a plaintiff's expert, testified that lupus ("bite of the wolf") is a disease in which "the immune system gets stupid and it loses its ability to discriminate the patient's tissues, normal tissues, from those foreign invaders that it's trying to protect your body from.... [I]n a nutshell, lupus is a problem where the immune system loses control and starts destroying the patient's tissues." Systemic Lupus Erythematosus "involves multiple symptoms in the body, not just one system, but can involve many."

I find that the credible evidence is also that had Coumadin been resumed and continued until the time that Mrs. Ryan had the stroke, it would have harmed her. And I further find that had low dose steroids been given, they would not have been effective to prevent the stroke.

Dr. Kane argues that because of the inconsistent verdicts, he is left with the worst possible result: owing the entire amount himself (minus the *pro tanto* credit for Dr. Adrian's settlement) because the jury found him liable and the trial court found Dr. Adrian not liable. Had the jury's reasoning on proximate cause prevailed on the cross-claim, Dr. Adrian and Dr. Kane would have been jointly and severally liable, and thus Dr. Kane presumably would have been liable for only $650,000. If, on the other hand, the trial court's reasoning on proximate cause had prevailed in both instances, then Dr. Kane would not have been liable at all. Dr. Kane contends that, because the trial court repudiated the jury verdict, the court erred in sustaining that verdict against his motion for a judgment n.o.v.

Dr. Kane's argument is not persuasive. The trial court listened to additional evidence in evaluating the cross-claim and made its ruling in a different factual context. The question addressed in the cross-claim was whether, in September 1986, Dr. Adrian, as a consultant to Dr. Kane for dermatological complications, was negligent in failing to diagnose Ms. Ryan's lupus and to treat it with steroids and Coumadin. The jury, on the other hand, evaluated whether, over a period of at least eight months—including the four months immediately before the stroke—Dr. Kane, as Ms. Ryan's treating physician, should have diagnosed and treated her condition. Dr. Gale McCarty, the Ryans' medical expert,

testified that as a consultant Dr. Adrian would not have been responsible for prescribing medicine, a task the primary caretaker would fulfill. The alleged proximate cause in this case was the failure to prescribe Coumadin and steroids. Thus, the two factfinders—jury and trial court—had different facts before them on which to base their respective verdicts.[2] This difference is highlighted in the trial court's findings:

> I cannot fault Dr. Adrian for anything through the March of—or April 1st, I should say, 1986, when the evidence indicates he and Dr. Kane discussed Mrs. Ryan's latest condition.

> Of course, the jury's verdict does not deal with the September '86 visit of Mrs. Ryan to Dr. Adrian because the jury did not have that question before them. But there was a great deal of evidence about that, both on the cross-claim and in the rest of the trial.

> I find that the credible evidence was that the stroke could not have been prevented. I simply disagree with what must have been the jury's verdict in this respect.

> I find that the credible evidence is also that had Coumadin been resumed and continued until the time that Mrs. Ryan had the stroke, it would have harmed her. And I further find that had low dose steroids been given, they would not have been effective to prevent the stroke.

> Therefore, even if Dr. Adrian was negligent in not notifying Dr. Kane about any results of the September '86 visit and tests, or alternatively in the absence of notification to Dr. Kane, if Dr. Adrian was negligent in not having done more himself as a result of that visit and those lab test results, neither of those was the

2. Dr. McCarty gave conflicting testimony, away from the jury, as to Dr. Adrian's culpability. She admitted that Dr. Adrian did not violate any medical standard of care in his role as dermatological consultant for Dr. Kane, with the exception of gathering a limited medical history when interviewing Ms. Ryan in September 1985. This breach of care, however, was not linked to Ms. Ryan's injuries. Dr. McCarty further testified that nothing Dr. Adrian did when consulting with Dr. Kane in September 1985, March 1986, or September 1986 contributed in any way to Ms. Ryan's stroke. On the other hand, Dr. McCarty did note during earlier testimony that if Dr. Adrian had properly consulted with Kane in September 1986, the stroke could have been "mitigated, helped or possibly prevented."

proximate cause of the injuries in question in my judgment.

Thus, the trial court explicitly based its findings on the facts germane to the cross-claim—a different mosaic from the one the jury considered. *Cf. Arnst v. Estes*, 136 Me. 272, 276, 8 A.2d 201, 204 (1939) ("[A] joint tortfeasor, or what in a legal sense is the same thing, one standing in the same relation as a joint tortfeasor, cannot complain that, as to his [or her] codefendant, there has been nonsuit, discontinuance, or favorable verdict").

Our conclusion is buttressed, not undermined, by the trial court's post-trial denial of a judgment n.o.v. If the trial court believed that the jury verdict was contrary to the weight of the evidence, it was required to grant a new trial. *See Washington v. A & H Garcias Trash Hauling Co.*, 584 A.2d 544, 545 (D.C.1990); *Aqui v. Isaac*, 342 A.2d 370, 372 (D.C.1975). The trial court acknowledged—gratuitously—that it disagreed with the jury's verdict, but the court also did not overturn that verdict, recognizing that the evidence raised an issue of proximate cause on which reasonable fact-finders could differ and that the jury's verdict for the Ryans was rationally based on the evidence. Viewing the evidence in the light most favorable to the Ryans, we cannot say that the jury's verdict was unwarranted. *See Weeda v. District of Columbia*, 521 A.2d 1156, 1160 (D.C.1987).

### B.

█ Dr. Kane argues that Dr. Jack Rabin, one of the Ryans' medical experts, was unqualified to provide his opinion on proxi-

mate cause[3] (whether Coumadin and low-dose steroids would have prevented Ms. Ryan's stroke) because he was a family practitioner with insignificant knowledge of and experience with lupus. We reject this argument. "It is well settled law that [a] physician is not incompetent to testify as an expert merely because he [or she] is not a specialist in the particular field of which he [or she] speaks." *Baerman v. Reisinger*, 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966) (internal quotation omitted); *see also Ornoff v. Kuhn and Kogan Chartered*, 549 A.2d 728, 731–32 (D.C.1988) (physician need only be knowledgeable about subject matter). Dr. Rabin testified that, in addition to conducting a general medical practice spanning 39 years, he had treated patients with lupus and was familiar with both the standard of care for treating lupus and the diagnostic criteria applied to lupus. The record evidence is sufficient to have allowed Dr. Rabin to testify before the jury. Dr. Kane's challenge to the expert witness's training and specialization, therefore, necessarily goes to the weight rather than the admissibility of Dr. Rabin's testimony. *See Baerman*, 124 U.S.App.D.C. at 181, 363 F.2d at 310.

### C.

█ Dr. Kane also argues that Dr. McCarty's testimony was insufficient to establish a jury question on proximate cause: whether low-dose steroids or Coumadin would have prevented the stroke. Citing *Gordon v. Neviaser*, 478 A.2d 292, 296 (D.C.1984), he stresses that Dr. McCarty did not testify "to a reasonable degree of

---

**3.** Dr. Rabin testified to a reasonable degree of medical certainty that he was:

> absolutely certain that if this patient had received treatment [of Coumadin and cortisone] ... the inflammation in the blood vessels that caused the excessive clotting and the excessive hemorrhaging would have been brought under control. It would be like putting water on a fire. You would put it out. You would have dampened it down so that she would survive without any damage.
>
> \*   \*   \*   \*   \*   \*
>
> And had there been follow up of the patient, somebody would have recognized that the sed

rate was changing, or was remaining elevated; somebody would have recognized that there was a continuing inflammation in blood vessels that would lead to more clots and possibly clots in the brain. It would have been recognized that the patient was in danger. [Ms. Ryan] is ready to go over the edge of a cliff, and it would have been avoided.

medical certainty." [4] Viewed in the light most favorable to the Ryans, as we must, Dr. McCarty's testimony was sufficient to create a jury issue of proximate cause. In addition to the testimony cited by Dr. Kane, see *supra* note 4, Dr. McCarty testified: "I think that earlier introduction of steroids would, in all medical likelihood, have decreased the chance of this large embolic phenomena occurring." And, when asked if she had an opinion based on a reasonable degree of medical certainty whether the failure to diagnose lupus in April 1986 was a substantial factor in causing Ms. Ryan's brain damage in October 1986, she succinctly replied "yes" and added: "the failure to treat substantially contributed to this outcome in that subsequent hospital admission." [5] Dr. McCarty's testimony, therefore, was sufficient to create a jury issue of proximate cause.

## II.

■ Dr. Kane contends the trial court erred in allowing, over objection, Dr. Joseph L. Tryon to testify about Ms. Ryan's future lost wages and benefits. Dr. Tryon based his estimates on the full-time job Ms. Ryan held at the Marriott Corporation before the birth of her child in 1985. Ms. Ryan had left Marriott to give birth and, thereafter, had accepted a lower paying part-time job, which she was to have started the day of her stroke. Dr. Kane argues that because Ms. Ryan wanted to be a homemaker at least part of each day, she had chosen voluntarily to work part-time. As a consequence, says Dr. Kane, Dr.

Tryon's estimates based on Ms. Ryan's full-time Marriott employment are flawed.

Dr. Kane's arguments are unconvincing. Both Ryans testified that Ms. Ryan intended to return to work full-time but for her medical condition. Mr. Ryan testified that Marriott had been holding Ms. Ryan's job for her but that, because of the swelling of her leg and her blood clots, Ms. Ryan was unable to work full-time. Ms. Ryan testified that she could not work full-time because of the problems with her leg and because she became easily fatigued.[6] Accordingly, there was ample evidentiary support for Dr. Tryon's economic projections based on assumed resumption of full-time employment.

## III.

■ Dr. Kane maintains the trial court abused its discretion in limiting his counsel's cross-examination of Dr. McCarty for bias, namely, counsel's effort to inquire into the circumstances of Dr. McCarty's departure from Georgetown University Hospital (where Ms. Ryan was admitted after her stroke). Cross-examination of a witness is a matter of right, see *Alford v. United States*, 282 U.S. 687, 691–92, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931); *The Ottowa*, 70 U.S. (3 Wall.) 268, 271, 18 L.Ed. 165 (1865); that right, however, is not unlimited. See *Reed v. United States*, 452 A.2d 1173, 1176 (D.C.1982), *cert. denied*, 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983); *Jackson v. District of Columbia*, 200 A.2d 199, 201 (D.C.1964). The trial court retains wide discretion to limit cross-examination to avoid harassment, confu-

---

**4.** Dr. Kane cites Dr. McCarty's testimony that the drugs "*might* have within a reasonable—reasonable medical certainty, abrogated the chances of her having that horrible event, the stoke" (emphasis added) and "[i]f active lupus inflammation ... had been suppressed during those months previous to when she came in with a major stroke event ... it *might* have substantially contributed to lessening or perhaps abrogating or stopping the possibility that she would have suffered such significant damage at that time." (Emphasis added.)

**5.** Dr. McCarty also described in some detail how steroids work to prevent the symptoms leading to a stroke. On redirect examination she stated:

"It is my feeling that active lupus should be treated with steroids. Mrs. Ryan had active lupus. And I think that earlier introduction of steroids would, in all medical likelihood, have decreased the chance of this large embolic phenomena occurring."

**6.** Dr. Kane's testimony is not inconsistent with the Ryans'. Dr. Kane wrote a letter to Marriott on September 2, 1986, stating:

I feel that *as long as she is able to bear weight comfortably and without significant adema or swelling of the leg* of the involved extremity, that she can return to work at present (emphasis added).

sion, or prejudice. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990); *cf. Forest Heights Biltmore Hotel v. Lubar,* 113 A.2d 568, 569 (D.C.1955) ("line of demarcation between proper and improper cross-examination frequently becomes narrow and shadowy and rests somewhat in the sound discretion of the trial court").

■ During cross-examination, Dr. Kane's counsel asked Dr. McCarty: "And aren't you currently upset with Georgetown over the manner in which they did not grant your tenure [ ] and did not renew your privilege?" Dr. McCarty responded: "This is not relevant to this case." The attorneys argued, away from the jury, over whether this questioning could continue. The trial court ruled that it "will not permit this line of inquiry. The jury has already heard the question that you did ask, and she's answered it.... [I]t's just too collateral here."

The trial court did not abuse its discretion in so ruling. The court may properly limit bias cross-examination if it concludes the evidence is "too collateral," *Hawkins v. United States,* 461 A.2d 1025, 1034 (D.C.1983), *cert. denied,* 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984), as "[t]he trial judge is the person who can best weigh the relevancy of disputed evidence against its tendency to confuse the jury in collateral issues." *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979). Even if the proposed line of questioning is relevant, the "trial court retains discretion to prevent repetitive, protracted, or cumulative cross-examination." *Sherer v. United States,* 470 A.2d 732, 737 (D.C.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). This rule allows the trial court to direct the trial in a way that assures the jury will focus on the central issues it must decide, rather than on a mini-trial of a marginally relevant or collateral issue.

The trial court was well within the proper exercise of its discretion in excluding the inquiry. *See id.* at 737. In all likelihood, further exploration of the reasons Dr. McCarty was denied tenure as a clinical professor, as well as renewal of privileges, at Georgetown University Hospital would have required a parade of witnesses on an issue that could have had only a remote bearing on possible bias against Dr. Kane—a doctor who had privileges at Georgetown but was apparently not among those who had a role in deciding Dr. McCarty's future.

IV.

■ Finally, Dr. Kane challenges the *pro tanto* credit the trial court gave him for the $300,000 Dr. Adrian paid the Ryans in settlement. He argues that the court instead should have granted a *pro rata,* or fifty percent, reduction. In *Washington v. Washington Hosp. Center,* 579 A.2d 177, 185–86 (D.C.1990), however, we noted:

> the settled rule [is] that a *pro rata* reduction is only appropriate in circumstances where the settling defendants are determined to be tortfeasors otherwise liable. In the absence of a determination of the settling defendants' liability *vel non,* both agree the credit is *pro tanto.* [Citations omitted.]

Because the trial court found Dr. Adrian not liable, a *pro rata* reduction would not be appropriate in this case.[7]

Dr. Kane argues that because of our decision in *Washington Healthcare Corp. v. Barrow,* 531 A.2d 226 (D.C.1987), the trial court was bound to find Dr. Adrian liable and thus to apply a *pro rata* credit. In *Washington Healthcare Corp.,* we held that if the jury's findings dispose of all contested issues of fact that govern the outcome of the non-jury phases of the case, the trial judge need only state its conclusion of law. *Id.* at 230. Dr. Kane contends

---

7. Dr. Kane also suggests that, in permitting the Ryans to switch from attacking Dr. Adrian to supporting him during consideration of the cross-claim, the trial court violated principles of estoppel. We have declined to apply "judicial estoppel" in similar circumstances. *See Washington Hosp. Center,* 579 A.2d at 189.

similarly, that the jury's verdict and the findings of fact on causation inherent in that verdict should extend to the cross-claim so that Dr. Adrian is held liable. As we have discussed in Part I. A., however, the jury and the trial court dealt with separate sets of facts, revealing different connections between Ms. Ryan and, respectively, Dr. Kane and Dr. Adrian. Accordingly, the trial court correctly applied a *pro tanto* reduction because the court found that Dr. Adrian was not liable. That finding was not clearly erroneous.

Affirmed.